**MARBLED MURRELET (Brachyramphus Marmoratus); Environmental Protection Information Center, Inc.;**

v.

**The PACIFIC LUMBER COMPANY.**

**No. C–93–1400 LCB.**

United States District Court, N.D. California.

June 19, 1995.

Mark Harris, Arcata, CA.

Rodney R. Jones, Mendocino, CA.

Macon Cowles, Macon Cowles & Associates, P.C., Boulder, CO.

Stephen C. Volker, Sierra Club Legal Defense Fund, Inc., San Francisco, CA.

Charles S. Crandall, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA.

William A. Rossbach, Rossbach & Whiston, Missoula, MT.

Patrick R. Bupara, U.S. Attorney's Office, San Francisco, CA.

James C. Kilbourne, Christiana P. Perry, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC.

Alson R. Kemp, Dale C. Lysak, William L. Marchant, Mark H. Penskar, Pillsbury Madison & Sutro, San Francisco, CA.

Jared G. Carter, Frank Shaw Bacik, Rawles Hinkle Carter Benke & Oglesby, Ukiah, CA.

Walter Wunderlich, Clifford T. Lee, Daniel E. Lungren, CA. State Atty. General's Office, San Francisco, CA.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court is the application of plaintiffs, the Environmental Protection Information Center ("EPIC") and the marbled murrelet, for an award of $1,136,-205.31 in attorneys' fees and costs pursuant to 16 U.S.C. § 1540(g)(4), and defendant Pacific Lumber Company's ("Pacific Lumber") response thereto. For the reasons set forth below, the court has determined that an award of $1,110,344.29 is both reasonable and appropriate in this case.

## I. BACKGROUND

On April 16, 1993, EPIC, acting on behalf of its members and the marbled murrelet, filed this action under the citizen suit provision of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. § 1540(g), against Pacific Lumber and various state and federal regulatory officials to enjoin the implementation of

Pacific Lumber's Timber Harvest Plan No. 1–90–237 HUM ("THP–237"). Pursuant to THP–237, Pacific Lumber proposed to harvest a 137 acre portion of the Owl Creek forest, a 440 acre stand of old-growth coastal coniferous forest ("old-growth") located on Pacific Lumber's private property in Humboldt County, California. The marbled murrelet is a rare seabird which nests almost exclusively in old-growth within its range in Northern California. In its complaint, EPIC alleged that Pacific Lumber's implementation of THP–237 would "harm" and "harass" the marbled murrelet, a "threatened" species under the ESA, in violation of the Act, by destroying a crucial portion of the bird's critical nesting habitat. EPIC also alleged that the state and federal regulatory officials who are charged with enforcing the state and federal endangered species acts were either unable or unwilling to act to curtail Pacific Lumber's unauthorized and illegal logging operations in THP–237, thereby abdicating their responsibility to EPIC, a non-profit, public interest group. EPIC sought preliminary and permanent injunctive relief in the form of an Order prohibiting the implementation of THP–237 and compelling the state and federal officials to act in accordance with their statutory and regulatory duties. EPIC also sought an award of reasonable attorneys' fees and costs under 16 U.S.C. § 1540(g)(4).

On September 1, 1993, the court entered an Order dismissing EPIC's claims against the state and federal regulatory officials. It did not, however, dismiss EPIC's claims against Pacific Lumber. After September 1, 1993, this case was placed on an expedited briefing and discovery schedule.

On November 17, 1993, the court granted plaintiffs' motion for a temporary restraining order. On December 21, 1993, the court held a full-day evidentiary hearing in response to plaintiffs' motion for a preliminary injunction. On February 2, 1994, the court granted plaintiffs' motion for a preliminary injunction and prohibited Pacific Lumber from engaging in further activities in THP–237 until further order of the court. The parties conducted extensive discovery during the Spring of 1994. Finally, a nine day non-jury trial began on August 15, 1994.

On February 25, 1995, the court issued a permanent injunction prohibiting Pacific Lumber's implementation of THP–237. The court found, among other things, that Pacific Lumber's implementation of THP–237 would sufficiently "harm" and "harass" the marbled murrelet such that a "take" of the species would occur in violation of the ESA. The court also found that the plaintiffs were entitled to recover their reasonable attorneys' fees and costs pursuant to 16 U.S.C. § 1540(g)(4).

Plaintiffs' attorneys filed their application for fees and costs on March 31, 1995. Pacific Lumber has filed both general and specific objections to plaintiffs' application. Finally, the court held a hearing on plaintiffs' application for fees and costs in San Francisco on June 1, 1995.

## II. DISCUSSION

### A. Appropriateness of an Award

In the final paragraph of its Memorandum Order dated February 24, 1995, the court found that the plaintiffs were entitled to recover their reasonable attorneys' fees and costs in accordance with 16 U.S.C. § 1540(g)(4). At that time, however, the court did not state its reasons for making this finding. Therefore, the court will briefly address the reasoning which supports its determination that an award of attorneys' fees and costs is appropriate in this case.

In any suit brought under the citizen suit provision of the ESA, the court may "award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such an award is appropriate." 16 U.S.C. § 1540(g)(4). In determining whether an award of attorneys' fees is appropriate, the court should consider whether the litigation brought by the party seeking an award has substantially contributed to the goals of the ESA. *Carson–Truckee Water Conservancy Dist. v. Secretary of Interior*, 748 F.2d 523 (9th Cir.1984), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 497 (1985). The dominant inquiry is "whether litigation by

that party has served the public interest by assisting the interpretation and implementation" of the ESA. *Carson–Truckee,* 748 F.2d at 525 (citations omitted).

■ EPIC's success in this litigation has substantially contributed to the goals of the ESA by ensuring the conservation of one of the few remaining marbled murrelet nesting habitats in California. This case was not a popular undertaking. No other public or private entity was willing to engage Pacific Lumber in what promised to be a difficult, complex and risky case to guarantee the survival of a threatened species. If EPIC had not undertaken its lonely efforts on behalf of the marbled murrelet, it is doubtful that the species would have maintained its existence throughout its historical range in Northern California. This is exactly the type of case that is encouraged by the citizen suit provision of the ESA.

Additionally, EPIC has served the public interest by assisting the interpretation and implementation of the ESA as it applies to the scope of activities that a private landowner may engage in on its own land. As far as the court is aware, this is the first case where a federal court has applied the "harm" and "harass" provisions of the ESA to permanently enjoin logging on private land to conserve the habitat of a threatened or endangered species. For all of these reasons, the court has determined that an award of attorneys' fees and costs is appropriate in this case.

### B. *What Constitutes a Reasonable Fee Award?*

The parties agree that the starting point for determining a reasonable fee award is the calculation of the "lodestar." *See, e.g., Jordan v. Multnomah County,* 815 F.2d 1258 (9th Cir.1987); *Chalmers v. Los Angeles,* 796 F.2d 1205 (9th Cir.1986). To determine the "lodestar," the court must multiply the amount of hours reasonably expended on the litigation by a reasonable hourly rate. *Chalmers,* 796 F.2d at 1210. According to the Ninth Circuit, "[a] 'strong presumption' exists that the lodestar figure represents a 'reasonable' fee, ..., and upward adjustments of the lodestar are proper only in

'rare' and 'exceptional'· cases, supported by specific evidence on the record and detailed findings by the district court." *Jordan,* 815 F.2d at 1262 (citations omitted).

EPIC's seven attorneys are seeking hourly rates ranging from $75.00 to $300.00 per hour for more than 4000 hours that they spent litigating this case. Pacific Lumber has challenged the reasonableness of both the hourly rates and the number of hours expended. Because the parties have addressed the hourly rate topic first in their briefs and arguments to the court, the court will also address this topic first.

#### 1. *Reasonable Hourly Rates*

■ In *Davis v. City and County of San Francisco,* 976 F.2d 1536 (9th Cir.1992), the Ninth Circuit stated that a reasonable hourly rate should be determined "by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity." *Davis,* 976 F.2d at 1545. Reasonable hourly rates must be calculated according to the prevailing market rates in the relevant legal community, with close attention paid to the fees charged by "lawyers of reasonably comparable skill, experience and reputation." *Id.* at 1545–46 (*quoting Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). In determining an appropriate market rate, the district court may consider a number of factors, including: the novelty and difficulty of the issues involved in the case; the skill required to litigate those issues; the preclusion of other employment; the customary fee; relevant time constraints; the amount at stake and the results obtained; the experience, reputation and ability of the attorneys; the "undesirability" of the case; and awards in similar suits. *Id.* at 893–94, 104 S.Ct. at 1546 (citations omitted).

In support of its application for fees and costs, EPIC has submitted the declarations of several Bay Area attorneys who have attested that the hourly rates that EPIC is seeking are within the range of fees that private attorneys of similar ability and reputation in San Francisco would charge their paying clients for legal work of this complexi-

ty. These affidavits indicate that Bay Area firms specializing in complex environmental litigation charge hourly rates of $90.00 to $125.00 per hour for lawyers with one to five years of experience, $160.00 to $200.00 per hour for lawyers with five to ten years of experience, and $200.00 to $300.00 per hour for lawyers with ten to twenty years of experience.

█ Pacific Lumber acknowledges that the rates described above are within the range of hourly rates charged by Bay Area attorneys of similar skill and ability in cases such as this (although Pacific Lumber contends that these rates are at the "high end" of this range).[1] Pacific Lumber, however, contends that the court should determine the reasonableness of EPIC's hourly rates based on the prevailing market rates in the communities where plaintiffs' counsel conduct their principal practice of law. This argument lacks merit.

The Ninth Circuit has repeatedly held that the relevant legal community is considered to be that of the forum district—here the Northern District of California. *See Gates v. Deukmejian,* 987 F.2d 1392, 1405 (9th Cir. 1992); *Davis v. Mason County,* 927 F.2d 1473, 1488 (9th Cir.), *cert. denied,* 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). In addition, the Ninth Circuit has held that the district court's determination of a reasonable hourly rate "is not made by reference to the rates actually charged by the prevailing party." *D'Emanuele v. Montgomery Ward & Co.,* 904 F.2d 1379, 1384 (9th Cir.1990) (*quoting Chalmers,* 796 F.2d at 1210). Therefore, the hourly rates that plaintiffs' counsel actually charge in their home communities is not relevant to the court's determination of what constitutes a reasonable hourly rate for attorneys of similar skill and ability in the San Francisco legal community.

This case has absolutely no connection to any forum other than the Northern District of California. The district court sits in San Francisco. All of the key issues were litigated before the court in San Francisco; the attorneys were required to attend several discovery hearings, the preliminary injunction hearing and the two week trial. Moreover, four of the plaintiffs' attorneys have national practices. The fact that these attorneys may reside in Boulder, Colorado; Missoula, Montana; and San Diego, California; is not a sufficient basis for the court to limit their fees to the prevailing rates in these communities. After carefully examining the parties' submissions, the court finds that the San Francisco Bay Area is the relevant legal community in this case. The court also finds that the hourly rates sought by EPIC's attorneys are squarely within the range of fees that San Francisco attorneys of similar skill and ability would charge their paying clients for legal work of similar complexity.

An application of the factors set forth in *Davis* to the facts of this case provides additional support for the court's determination that the hourly rates sought by EPIC's counsel are reasonable. This case is unprecedented, both legally and factually. EPIC's counsel worked under enormous time pressure, in the face of considerable resistance from Pacific Lumber and its attorneys, to prepare a case that no one else was willing to take. EPIC's lawyers were both outnumbered (by a ratio of more than three to one) and outspent by Pacific Lumber's attorneys. Nevertheless, they were able to prove that the elusive marbled murrelet is nesting in THP–237. Given the skill required to prove this issue through the use of data compiled by, and under the control of, Pacific Lumber; the burdensome time constraints imposed by the court; the enormous consequences at stake; and the unprecedented results achieved; the court finds that the hourly rates described below are appropriate in this case.

### a. *Macon Cowles*

█ Macon Cowles is a 1975 graduate of the University of Colorado Law School. He has 20 years of experience as a trial attorney specializing in representing plaintiffs in toxic tort and environmental cases in the western United States. He recently served as the

---

1. In many instances, the hourly rates sought by EPIC's attorneys are substantially similar to, and sometimes less than, the hourly rates that Pacific Lumber paid its San Francisco attorneys to perform similar tasks to defend this case.

lead environmental attorney in the *Exxon Valdez Oil Spill Litigation*, where he sued for damages on account of injury to the environment. Mr. Cowles was also appointed by the state and federal courts of Alaska to serve as one of the seven attorneys on the Plaintiffs' Executive Committee in the consolidated *Exxon Valdez Oil Spill Litigation*. In 1993, Mr. Cowles was the chief trial attorney in the case of *Escamilla v. ASARCO, Inc.,* where he won the largest environmental damages verdict, $28 million, in Colorado history.

In this case, Mr. Cowles served as EPIC's chief trial counsel from the fall of 1993 to the present. In this role, Mr. Cowles oversaw the work of five attorneys in every aspect of the case. He was principally responsible for planning and executing the plaintiffs' trial strategy, conducting fact and expert discovery, obtaining expert opinion evidence, presenting scientific proof in the case, and cross-examining Pacific Lumber's expert witnesses. During the course of this litigation, Mr. Cowles developed a comprehensive understanding of marbled murrelet biology, which enabled him to present the critical scientific and factual evidence that was necessary to prove that the marbled murrelet is using THP–237 for nesting purposes.

Mr. Cowles is seeking an hourly rate of $300.00 per hour. After considering Mr. Cowles' skill and experience, as well as the extraordinary difficulty that he faced in preparing and presenting this case, the court finds that Mr. Cowles' proffered hourly rate is reasonable.

### b. *William Rossbach*

■ William Rossbach is a 1977 graduate of the University of Montana School of Law. He has 15 years of experience as a trial attorney specializing in representing plaintiffs in toxic tort and environmental cases, including claims related to asbestos, solvents, heavy metals and groundwater pollutants. As a result of this litigation, Mr. Rossbach has developed significant experience and expertise in a variety of scientific and technical fields, including heavy metal contamination, environmental monitoring, marine biology and avian ecology. Because of this expertise, in 1991, Mr. Rossbach was designated by the

Plaintiffs' Executive Committee in the consolidated *Exxon Valdez Oil Spill Litigation* to act as the attorney responsible for compiling the evidence and experts necessary to prove natural resources and fisheries damage as a result of the oil spill, and to defend against the scientific evidence presented by the defendants Exxon and Alyeska.

During the course of the *Exxon Valdez Oil Spill Litigation,* Mr. Rossbach developed significant expertise in the biology and ecology of shorebirds, including alcids such as the marbled murrelet, that were killed or injured by the oil spill. Mr. Rossbach was retained by EPIC to apply this expertise to the facts of the instant case. Mr. Rossbach assisted Mr. Cowles and Mr. Crandall in the development of the legal and scientific strategy for the case. He also conducted extensive research and investigation into the scientific and technical issues of the case, worked with the plaintiffs' experts in murrelet biology, and prepared a detailed outline of murrelet biology to assist Mr. Cowles in the cross-examination of Pacific Lumber's expert witnesses. Mr. Rossbach was unable to participate in the trial itself because of the birth of his first child; however, he kept in daily contact with the trial team and assisted in the development of cross-examination through the electronic transfer of memoranda.

Mr. Rossbach is seeking an hourly rate of $275.00 per hour. After considering Mr. Rossbach's skill and experience, including his extensive experience and expertise in the field of marbled murrelet biology, and Mr. Rossbach's important contribution to the scientific aspects of this case, the court finds that Mr. Rossbach's proffered hourly rate is reasonable.

### c. *Charles Stevens Crandall*

■ Charles Stevens Crandall is a 1977 graduate of the University of Virginia School of Law. He has 17 years of experience as a trial attorney, including 11 years as an Assistant United States Attorney prosecuting civil and criminal environmental cases in California and New Jersey, and six years representing private plaintiffs in environmental class actions. Mr. Crandall also participated in

the *Exxon Valdez Oil Spill Litigation,* where he assisted plaintiffs' co-lead counsel in putting together the evidence and experts necessary to prove natural resource damage, and served as a member of the trial team in Phase II of the trial (natural resource damages and compensatory damages). Mr. Crandall has also served as lead counsel in a number of environmental lawsuits, including a citizen's suit which successfully obtained wetlands mitigation and restoration in Southern California, and another citizen's suit which successfully obtained an injunction prohibiting new developments on private landholdings in the Cleveland National Forest.

In this case, Mr. Crandall assisted Mr. Cowles in the development of the plaintiffs' litigation strategies, and the factual investigation of Pacific Lumber's surreptitious logging in THP–237 in 1992 and the validity of the company's marbled murrelet surveys. Mr. Crandall took several depositions of fact and expert witnesses and helped the trial team prepare for others. He also played a key role at the trial, where developed and presented the cross-examination of several of Pacific Lumber's important witnesses, and assisted Mr. Cowles in the effective presentation of the plaintiffs' case.

Mr. Crandall is seeking an hourly rate of $290.00 per hour. After considering Mr. Crandall's skill and experience, particularly his extensive experience in prosecuting environmental cases, and Mr. Crandall's key role during the trial of this case, the court finds that Mr. Crandall's proffered hourly rate is reasonable.

#### d. *Susan O'Neill*

Susan O'Neill is a 1984 honors graduate of the Boston College Law School. She has 11 years of litigation experience, including seven years of experience litigating environmental, public interest, and employment discrimination cases. Since 1991, Ms. O'Neill has been associated with Macon Cowles, and she has assisted him in both the *Escamilla* and *Marbled Murrelet* cases.

In this case, Ms. O'Neill was primarily responsible for drafting the plaintiffs' motions, supporting briefs, written discovery requests, pre-trial and post-trial briefs, and application for attorneys' fees and costs. She also took and defended depositions, and examined witnesses at trial.

Ms. O'Neill is seeking an hourly rate of $190.00 per hour. After considering Ms. O'Neill's skill and experience, as well as the important role that she played during the preparation and trial of this case, the court finds that Ms. O'Neill's proffered hourly rate is reasonable.[2]

#### e. *Mark Harris*

Mark Harris is a 1989 graduate of the University of San Francisco School of Law. He has six years of trial experience in criminal and civil cases, in both state and federal court. Since opening his own legal practice in Arcata, California in 1990, Mr. Harris has tried a number of cases involving criminal defense, civil rights, real property disputes, and environmental issues.

Mr. Harris, along with Rodney Jones, initiated this lawsuit on behalf of EPIC in state court in 1992. Mr. Harris then initiated the present litigation in federal court in April 1993. Mr. Harris prosecuted this case virtually by himself during the entire first year of the litigation. He prepared and filed the complaint, successfully defended Pacific Lumber's motion to dismiss, interviewed witnesses, took and defended depositions, acquired the bulk of the information that the plaintiffs ultimately received from state and federal regulatory officials, retained expert witnesses, and prepared all of the pleadings relating to plaintiffs' application for a tempo-

**2.** During the court's June 1, 1995 hearing on plaintiffs' fee petition, Pacific Lumber's attorney discounted Ms. O'Neill's qualifications by stating that she "is a nice person, but she is not skilled." This characterization is not only inappropriate, it is also untrue. Ms. O'Neill drafted a substantial number of the plaintiffs' written submissions to the court, and she demonstrated superior skill and acumen in her completion of this task. From the court's vantage point, her papers were always filed on time, in proper form, and, in many instances, they were persuasive. By contrast, Pacific Lumber's attorneys assigned more than a dozen junior-level attorneys to perform the same tasks that were completed by Ms. O'Neill. In many instances, these attorneys billed Pacific Lumber substantially higher hourly rates than Ms. O'Neill is now seeking.

rary restraining order and preliminary injunction. Mr. Harris was the lead attorney in this case until he received the assistance of Mr. Cowles and his trial team in December 1993. After Mr. Cowles took over as lead counsel, Mr. Harris remained an integral part of the plaintiffs' trial team. He assisted in the preparation of the plaintiffs' trial strategy, wrote the plaintiffs' trial brief, presented evidence at the trial, cross-examined Pacific Lumber's witnesses, and assisted in the preparation of plaintiffs' application for fees and costs.

Mr. Harris is seeking an hourly rate of $175.00 per hour. After considering Mr. Harris' skill and experience, including the fundamental role that he played in the initiation, preparation and trial of this case, the court finds that Mr. Harris' proffered hourly rate is reasonable.

 In addition to his hourly rate of $175.00 per hour, Mr. Harris is seeking an enhancement, or "multiplier," of his hourly rate to be determined by the court. Mr. Harris is seeking this enhancement to compensate him for the detrimental impact that this case has had on his legal practice due to the undesirability in his locality of taking on a case against Pacific Lumber, and because of the enormous time pressures placed upon him during the early stages of the litigation. Although there is considerable merit to the arguments that Mr. Harris has advanced in support of his request for an enhancement, the court will deny this request.

 Under the standards set by the Supreme Court and the Ninth Circuit, an applicant who is seeking an enhancement bears a "heavy burden" to overcome the strong presumption that the basic fee is reasonable. *See Stewart v. Gates,* 987 F.2d 1450, 1453 (9th Cir.1993). The applicant must first demonstrate that an enhancement is *"necessary* to the determination of a reasonable fee." *Stewart,* 987 F.2d at 1453 (*quoting City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992) (emphasis in original)). The applicant must demonstrate that any factor that he is relying on to support an enhancement is not subsumed within the basic fee. *Id.* The district court may not

consider factors such as the risk of nonpayment of fees, the novelty of the issues raised in the case, the special skill and experience of counsel, or the quality of representation and the results obtained from the litigation, in determining whether to award an enhancement. *Id.* (*citing Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)). All of these factors are assumed to be fully reflected in the basic fee, and they may not serve as an independent basis to award an enhancement. *Id.*

Mr. Harris has not presented sufficient evidence to demonstrate that an enhancement of his $175.00 per hour fee is warranted. While it may be true that representing environmental groups in lawsuits against Pacific Lumber is terribly unpopular in Humboldt County, California, where the local economy is heavily dependent upon the timber industry, it is equally true that Mr. Harris' reputation as a skilled trial attorney has been greatly enhanced by his success in this case. Also, while Mr. Harris may have been overwhelmed during the early stages of this litigation, his time commitment to the case already has been factored in to the court's calculation of a reasonable award for Mr. Harris' services. Regardless of an attorney's skill or reputation, $175.00 per hour is higher than the fee that an attorney with only five years of experience can expect to receive for his services in either San Francisco or Arcata, California. The court, however, believes that $175.00 per hour represents a reasonable hourly rate for Mr. Harris' substantial contribution to this case. Therefore, Mr. Harris will be fully compensated at this rate.

#### f. *Rodney Jones*

 Rodney Jones is a 1971 graduate of the University of Southern California Law Center. He has 24 years of legal experience, including five years of experience representing environmental groups or activists in state court cases against timber companies and regulatory officials. Mr. Jones and Mr. Harris initiated state court proceedings against Pacific Lumber in 1992 to enjoin the implementation of THP–237. At the same time, Mr. Jones occasionally assisted Mr. Harris in

his prosecution of the federal action against Pacific Lumber. His involvement in the federal litigation extended into the first pretrial hearing on defendants' motions to dismiss the complaint in August 1993. Thereafter, he periodically provided advice to Mr. Harris to assist in the prosecution of this case.

Mr. Jones is seeking an hourly rate of $175.00 per hour for his limited service in this case. After considering Mr. Jones' skill and experience, the court finds that his proffered hourly rate is reasonable.

### g. Brian Gaffney

Brian Gaffney is a 1993 graduate of the New College of California School of Law. While he was a law student, Mr. Gaffney devoted a substantial portion of his time working as a law clerk for the Trust for Public Land and the Sierra Club Legal Defense Fund. Upon graduation from law school, Mr. Gaffney opened his own legal practice, in which he represents private citizens groups in cases involving forestry, endangered species and clean water. Since his graduation from law school, Mr. Gaffney has worked in a supporting position under Mr. Harris, assisting him in the research and writing of pre-trial motions and the trial brief, keeping abreast of regulatory developments such as the proposed critical habitat designation for the marbled murrelet, and obtaining documentary evidence from state and federal regulatory officials.

Because this case is Mr. Gaffney's first significant exposure to federal litigation, Mr. Gaffney is seeking an hourly rate of only $50.00 per hour for time expended before he was admitted to practice in the Northern District of California, and $75.00 per hour for the time expended thereafter. The court is satisfied that Mr. Gaffney's proffered hourly rate is reasonable in light of his level of experience and contribution to this case.

### 2. Reasonable Time Expended

A district court must base a finding of reasonable hours on evidence and sound documentation. "The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." Gates, 987 F.2d at 1397 (citation omitted).

"The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." Id. at 1397–98 (citation omitted). The court may reduce the applicant's hours where documentation of the hours is inadequate, if the case was overstaffed and hours were duplicative, and if the hours expended were unnecessary or excessive. Chalmers, 796 F.2d at 1210.

The parties have been able to resolve a few of their differences regarding the number of reasonable hours. For example, Pacific Lumber has withdrawn its general objection to EPIC's time spent litigating the related state court action because its examination of EPIC's contemporaneous time records revealed that EPIC is not seeking any significant reimbursement for this time. Nevertheless, a number of disputes remain unresolved. Pacific Lumber has raised several challenges to certain categories of time that it contends were unnecessary because they did not advance the outcome of the case. The court will address each of these categories below.

### a. Inadequate Documentation

Pacific Lumber initially challenged EPIC's time records as being inadequate because EPIC's attorneys "bundled" their time. Pacific Lumber argued that because EPIC's attorneys commonly recorded a number of separate tasks under single blocks of time, it was unable to determine how much time was reasonably spent on each task. Although this argument has some minor facial appeal, it is not well-supported in the case law. As the Supreme Court noted in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), "[p]laintiff's counsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures." Hensley, 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12. See also Davis, 976 F.2d at 1542. EPIC's attorneys have sufficiently documented the majority of their time. Although bundled time entries are regrettably common in today's legal econo-

my, the fact that time entries are bundled does not, by itself, signify that a fee application is fatally flawed.[3]

■ Pacific Lumber has specifically identified 41.68 hours of time entries where it contends that little or no explanation has been entered about the tasks performed. Most of these time entries are for telephone calls placed by Macon Cowles, Mark Harris and Rodney Jones during the early stages of the case. EPIC contends that these discussions involved matters that were related to the case.

The court has examined each of the time entries identified by Pacific Lumber and it has determined that 4.7 hours, totalling $585.00, should be disallowed. Most of the time entries identified by Pacific Lumber indicate telephone calls from one attorney to another, or from an attorney to the client. Not all of these entries have notations regarding the topic of the telephone conversations. In many instances, however, the topic of the conversation can be readily ascertained by examining the surrounding time entries. Moreover, the court has no reason to doubt EPIC's representation that these conversations were related to the prosecution of this case. The time entries that will be disallowed represent instances where the purpose of the task performed truly cannot be determined.

### b. Time Spent Appealing the Court's Dismissal of the State and Federal Defendants

■ On September 1, 1993, the district court entered an Order dismissing the state and federal defendants from this action. EPIC filed a notice of appeal on January 28, 1994. Pacific Lumber has objected to 27.28 hours that it contends were spent on tasks related to this appeal by EPIC's attorneys. Pacific Lumber argues that this time is not sufficiently connected to the outcome of EPIC's case against it to warrant reimbursement. EPIC, however, contends that it is only seeking reimbursement for a few of the hours that it expended in connection with

this appeal because this time involved the same core facts and issues as its case against Pacific Lumber, and EPIC used the product of its labor in the larger case against Pacific Lumber.

After carefully examining the specific time entries challenged by Pacific Lumber, the court finds that only 13.85 of these hours, 13.25 hours expended by Brian Gaffney and 0.60 hours expended by Mark Harris, are directly related to EPIC's appeal. Moreover, based on Pacific Lumber's submission to the court, the court has no reason to doubt EPIC's assertion that these hours were reasonably expended in connection with the prosecution of EPIC's case against Pacific Lumber. Therefore, the court finds that these hours were reasonably expended.

### c. Time Spent On Sweet Home Amicus Brief

■ On March 11, 1994, the United States Court of Appeals, District of Columbia Circuit, ruled in *Sweet Home Chapter of Communities for a Great Oregon v. Babbitt,* 17 F.3d 1463 (D.C.Cir.1994), that Congress did not intend the regulatory interpretation of the word "harm," as it appears in the ESA's definition of the word "take," to include "significant habitat modification or degradation." The District of Columbia Circuit's holding in *Sweet Home* is in direct conflict with the Ninth Circuit's holding in *Palila v. Hawaii Dep't of Land & Natural Resources,* 852 F.2d 1106 (9th Cir.1988). Consequently, on January 6, 1995, the United States Supreme Court granted the government's petition for certiorari in *Sweet Home* to resolve the split in the circuits on this important issue. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* — U.S. ——, 115 S.Ct. 714, 130 L.Ed.2d 621 (1995).

EPIC is understandably concerned about the Supreme Court's resolution of this issue. During the trial, Pacific Lumber argued that this court should reject the Ninth Circuit's holding in *Palila* and follow the District of Columbia Circuit's more recent holding in *Sweet Home.* While the court refused to do so in its Memorandum Order dated February

---

**3.** In fact, *all* of the attorneys in this case bundled their time entries. The majority of these entries, however, contain sufficient information for the court to determine whether the time indicated was reasonably spent on the tasks performed.

24, 1995, the Supreme Court's imminent resolution of the *Sweet Home* case arguably could have an impact on this case as it proceeds through the appellate process. After the Supreme Court granted the government's petition for certiorari in the *Sweet Home* case, EPIC's lawyers engaged in a series of discussions to decide whether they should file an *amicus curiae* brief in the Supreme Court. Pacific Lumber contends that it should not be billed for this time. After much thoughtful consideration, the court agrees.

The Supreme Court's consideration of the *Sweet Home* case is not directly related to the victory that EPIC achieved in the district court. Although the Supreme Court's decision in *Sweet Home* undoubtedly will have a major impact on any future interpretation of the "harm" provision of the ESA, EPIC's victory in this case was based on this court's consideration of the evidence that was admitted at trial in light of the law as it has been interpreted by the Ninth Circuit. The time that EPIC spent after the trial in this case trying to decide whether to file an *amicus* brief in another case, even though it may be relevant to this case, should not be charged to Pacific Lumber. Consequently, the court will reduce EPIC's fee request by $6,351.00 to account for the time that EPIC's attorneys spent reviewing the *Sweet Home* matter after January 6, 1995.[4]

### d. Time Spent Attempting to Persuade State and Federal Regulatory Officials to Enforce the ESA

■ Pacific Lumber contends that the 31.92 hours that Mark Harris spent trying to persuade state and federal officials to enforce their respective endangered species acts should be disallowed. Pacific Lumber argues that this time was not reasonably expended in furtherance of EPIC's case. This argument is disingenuous.

EPIC initiated this lawsuit to prevent the destruction of one of the few remaining nesting habitats of the marbled murrelet in California after state and federal officials failed

to take action against Pacific Lumber for committing two blatant violations of the ESA. In June and November 1992, Pacific Lumber conducted clandestine logging operations in THP–237 after it learned of the presence of marbled murrelets. Some of the evidence admitted at trial indicates that officials in the California Department of Fish and Game ("DFG") and United States Fish and Wildlife Service ("USF & WS") believed that Pacific Lumber's implementation of THP–237 would cause a "take" of the marbled murrelet in violation of the ESA, yet the agencies took no action against Pacific Lumber when it surreptitiously logged portions of the forest in 1992.

The California Board of Forestry's approval of THP–237 was made contingent upon Pacific Lumber's conducting marbled murrelet surveys in Owl Creek in compliance with the Pacific Seabird Group's "Methods for Surveying Marbled Murrelets at Inland Forested Sites" ("PSG Protocol"), and Pacific Lumber's sharing of its survey results with the DFG to ensure that no "take" of the marbled murrelet would occur. Nevertheless, a great deal of the evidence admitted at trial indicates that Pacific Lumber either ignored or circumvented the requirements of the PSG Protocol, and that it never fully shared the results of its surveys with the DFG. Once again, the agencies took no action against Pacific Lumber.

If the regulatory officials employed by the State of California and the United States had fulfilled their regulatory duties, EPIC's lawsuit against Pacific Lumber would not have been necessary. Consequently, the time that Mark Harris spent trying to persuade state and federal officials to enforce the Endangered Species Act is fully compensable.

### e. Summarizing Depositions

■ Pacific Lumber has objected to 175 hours that EPIC's attorneys spent summarizing depositions and transcripts. Pacific Lumber argues that these tasks should have been performed by paralegals instead of sen-

---

4. The court will not, however, disallow Macon Cowles' time entry for May 6, 1994, in which he spent six tenths of an hour reviewing the *Sweet Home* petition for rehearing *en banc* before the District of Columbia Circuit. This time was properly expended in anticipation of Mr. Kemp's argument at trial that the court should follow the *Sweet Home* decision.

ior-level attorneys, and Pacific Lumber is seeking a reduction of these fees to paralegal rates. In response, EPIC contends that it was necessary for its senior-level attorneys to summarize the deposition transcripts of witnesses, especially the depositions of Pacific Lumber's expert witnesses and high-level company officials, to properly develop this case for trial and prepare for cross-examination. Based on the circumstances of this case, the court finds that EPIC's time spent summarizing depositions was reasonably expended.

EPIC deposed 31 witnesses, during a very short period of time, to prepare for both the preliminary injunction hearing and the trial. EPIC's lead trial attorney, Macon Cowles, spent 83 hours summarizing approximately two-thirds of the 31 depositions, most notably the depositions of Pacific Lumber's expert witnesses and high-level company officials. In some cases, where a party has the luxury of time and a sizeable staff, it may be practical for junior-level attorneys or paralegals to summarize the depositions of fact witnesses. In this case, however, where a small number of attorneys had the burden of proving the existence of an esoteric species on the defendant's private land, and the defendant apparently engaged in an effort to conceal relevant documentary evidence, it was quite appropriate for the plaintiffs' lead trial attorney to take extra time to prepare for the introduction of important testimonial evidence. After carefully examining the time entries challenged by Pacific Lumber, the court finds that this time was reasonably expended.

### f. *Two Attorneys Attending Depositions*

■ Pacific Lumber has objected to 81.60 hours where two of EPIC's senior attorneys attended the same deposition of Pacific Lumber's witnesses. Pacific Lumber has not objected to the time expended by the attorney taking the deposition; however, it argues that the time expended by the second attorney who merely attended the deposition is duplicative. In response, EPIC argues that it was reasonable and necessary for it to send two senior-level attorneys to certain depositions because Pacific Lumber was hiding the truth. According to EPIC one attorney would ask questions of the witness and handle Pacific Lumber's objections, while the other attorney would evaluate the demeanor and veracity of the witness.

While the court has already acknowledged the difficulty that EPIC's attorneys had in extracting information from Pacific Lumber, in this case, it believes that the attendance of a second senior-level attorney at these depositions was unnecessary, especially in light of the skill levels that support the hourly rates that plaintiffs' counsel are seeking. In some cases, it may be necessary to have two attorneys attend a deposition for a plaintiff. For example, if a defendant is paying two or three attorneys to defend a deposition of a key witness, it may be reasonable for a plaintiff·to have two attorneys on hand to ensure that the deposition operates fairly. In this case, however, EPIC has not sufficiently demonstrated that the attendance of its second attorney, though preferable, was reasonable and necessary for each of the depositions identified by Pacific Lumber.

After reviewing the time entries identified by Pacific Lumber, the court has determined that 61.3 hours of the attorneys' time entries, totalling $17,830.00, are duplicative.[5] These fees will be disallowed.

### g. *Rossbach Time on Murrelet Biology*

■ Pacific Lumber has objected to 84.25 hours that William Rossbach spent "generally learning" about marbled murrelet biology between October 1993 and March 1994. Pacific Lumber contends that these hours are duplicative because they were expended in addition to the time that Mr. Rossbach spent reviewing marbled murrelet articles to prepare for defending depositions and to help prepare questions for the cross-examination of Pacific Lumber's expert witnesses. Pacific Lumber argues that, if it was necessary to perform this research at all, it could have been done by EPIC's expert witnesses in less time and for less money. In response, EPIC

---

**5.** The court will disallow $8,790.00 of Mr. Cowles' time, $4,060.00 of Mr. Crandall's time, $1375.00 of Mr. Rossbach's time, $1330.00 of Ms. O'Neill's time, and $2275.00 of Mr. Harris' time.

argues that Mr. Rossbach spent these hours distilling the scientific research on the marbled murrelet and preparing an outline for Macon Cowles to use during the cross-examination of Pacific Lumber's expert witnesses. After reviewing the parties' arguments and Mr. Rossbach's time entries, the court finds that this time was reasonably expended.

Trial attorneys are often called upon to gain expertise in a variety of areas beyond their training in the law. In this case, Mr. Rossbach was delegated the task of conferring with biologists and other experts, reviewing scientific literature on the marbled murrelet, and distilling the knowledge that he obtained from this information into a format that could be used by EPIC's trial team. This was not a task that could be performed by an expert witness who is not trained in the law. Given the obscurity of the marbled murrelet, and the importance of effectively cross-examining Pacific Lumber's expert witnesses, who have spent hundreds of hours studying the marbled murrelet, it was not unreasonable for Mr. Rossbach to spend 84.25 supplementing his knowledge about the marbled murrelet and preparing an outline of questions for Mr. Cowles to ask during cross-examination. Consequently, these hours will not be disallowed.

### h. Burkett Motion and Evans Testimony

Pacific Lumber contends that the 35.90 hours that EPIC's attorneys spent preparing a motion for a protective order to prevent Pacific Lumber from contacting Esther Burkett's supervisors at the California Department of Fish & Game, and preparing for Larry Evans' testimony at trial, should be disallowed because these tasks "lead nowhere." Pacific Lumber apparently misunderstands the applicable Ninth Circuit standard for determining whether to award attorneys' fees under a fee-shifting statute. The standard is not whether each and every task performed by the prevailing party leads to a successful result, but whether the time expended on each task is reasonable in relation to the entire litigation. *See Davis,* 976 F.2d at 1543; *Cabrales v. County of Los Angeles,* 935 F.2d 1050 (9th Cir.1991); *Planned Parenthood of Central & Northern Arizona v. Arizona,* 789 F.2d 1348 (9th Cir.

1986). "Just as time spent on losing claims can contribute to the success of other claims, time spent on a losing stage of litigation contributes to success because it constitutes a step toward victory." *Cabrales,* 935 F.2d at 1052. In *Cabrales,* the Ninth Circuit recognized that time spent on losing claims may be compensable if it contributes to the success of the plaintiff's case:

> Rare, indeed, is the litigant who doesn't lose some skirmishes on the way to winning the war. Lawsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is part of winning. The [defendant] would have us scalpel out attorney's fees for every setback, no matter how temporary, regardless of its relationship to the ultimate disposition of the case. This makes little sense.

*Id.* at 1053.

In this case, EPIC did not secure a protective order on behalf of Esther Burkett, and Larry Evans' testimony was ruled inadmissible. Nevertheless, the court believes that the time EPIC spent on these two tasks is compensable because they contributed, albeit in a small way, to EPIC's ultimate success in this lawsuit.

### i. Discovery Motions

Pacific Lumber has objected to 161.40 hours that EPIC spent working on discovery motions on the ground that this time did not contribute to the outcome of EPIC's case. Pacific Lumber contends that EPIC's reimbursement for this time should be cut in half because EPIC lost on at least half of the positions that it took in its discovery motions. An examination of the record, however, reveals that the hours expended by EPIC during the discovery process were both reasonable and necessary to bring this case to a successful conclusion.

During the course of discovery, the parties engaged in a series of contentious battles over seemingly every piece of evidence that was ultimately produced by Pacific Lumber. Between February 10, 1994, and May 24, 1994, United States Magistrate Judge Owen

E. Woodruff, Jr. issued *ten* court orders ruling on various discovery disputes. Although EPIC did not prevail on each of its discovery motions, especially early on, EPIC eventually succeeded in obtaining a number of court orders compelling Pacific Lumber to produce a great deal of relevant evidence. For example, on March 15, 1994, Pacific Lumber was ordered to show EPIC's representatives and expert witnesses the location of the marbled murrelet survey stations in THP–237. (Order dated March 15, 1994, at 1.) On May 24, 1994, Magistrate Judge Woodruff ordered Pacific Lumber to turn over additional documents and allowed EPIC to take additional depositions at Pacific Lumber's expense. (Order dated May 24, 1994, at 2.) Finally, on June 13, 1994, Magistrate Judge Woodruff imposed Rule 37 sanctions against Pacific Lumber, stating:

> The fact that Pacific Lumber has belatedly produced documents only after their existence was revealed through another source raises serious concerns about the adequacy of its initial review and possible deliberate failure to produce documents.[6]

(Order dated June 13, 1994, at 4.)

After thoroughly examining the record, the court finds that all of the time expended by EPIC during the discovery process was reasonable and necessary to secure the outcome in this case. *See Cabrales*, 935 F.2d at 1052–53. Although Pacific Lumber denies that it was being obstructionist during the course of this litigation, the record clearly indicates that Pacific Lumber repeatedly withheld relevant information from the plaintiffs until almost the last day of trial. Pacific Lumber may have the right to play "hardball" when defending its client's interests, but it should bear the costs associated with pursuing this type of obstructionist strategy. *See Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 886 F.2d 1545, 1557 (9th Cir.1989); *Burgess*

*v. Premier Corp.*, 727 F.2d 826, 841 (9th Cir.1984).

### j. Richard Pearl

█ Plaintiffs are seeking reimbursement of $1,095.02 that they spent to retain Richard Pearl, an attorney in San Francisco who has particular expertise in the area of fee awards. While the Ninth Circuit has held that attorneys may recover for the time they spend in preparing an application for an award of fees, *see Davis*, 976 F.2d at 1544 (citations omitted), the court believes that plaintiffs' retention of Mr. Pearl was an overreaction to their need to perform a service that plaintiffs' attorneys were already fully skilled to provide. Presenting to the court a complete and descriptive chronicle of the tasks provided by the plaintiffs' attorneys, though formidable, should not have been such a challenge as to warrant hiring an expert to explain what the attorneys did.

At the June 1, 1995 hearing, plaintiffs' counsel conceded that Mr. Pearl did not perform any work that plaintiffs were incapable of performing themselves. Plaintiffs' counsel, however, argued that retaining Mr. Pearl was more efficient and cost-effective in the long run because Mr. Pearl saved the plaintiffs considerable time that they would have otherwise spent researching the standard for fee awards in the Ninth Circuit. While this may be true, the court still finds that the retention of Mr. Pearl was unnecessary. This is not the first case that plaintiffs' counsel has litigated in this circuit under the citizen suit provision of the ESA. More importantly, the court already had determined that an award of attorneys' fees and costs was appropriate before the plaintiffs retained Mr. Pearl. The only question to be determined was "what constitutes a reasonable award?"

---

**6.** Between June 14, 1994 and the end of the trial, Pacific Lumber did nothing to alleviate the court's concerns about its improper conduct during discovery. On the second day of trial, August 16, 1994, Pacific Lumber produced, for the first time, the original survey data sheets for the 1992 survey season. These data sheets were the basis for at least one of the discovery motion's that EPIC "lost." (*See* Order dated February 22, 1994, denying EPIC's motion for leave to conduct document depositions of the custodian of records of consulting companies hired by Pacific Lumber to perform marbled murrelet surveys on THP–237.) Moreover, on the second to last day of trial; and in response to a verbal court order, Pacific Lumber produced, for the first time, internal documents showing that THP–237 is among the most suitable nesting habitat for the marbled murrelet on its property.

Heralding back to a familiar refrain in this opinion, if the plaintiffs' attorneys are as experienced and skilled as their proffered hourly rates suggest they are, an expenditure to have an outside expert do what they are themselves thoroughly familiar with is simply excessive and, hence, unreasonable. Consequently, plaintiffs' request for reimbursement of the $1,095.02 that it spent to retain Mr. Pearl will be disallowed.

### k. *Research and Drafting*

■ Pacific Lumber has objected to 29 hours that two of EPIC's senior attorneys spent researching various topics and drafting documents such as notices of depositions and subpoenas. Pacific Lumber argues that these tasks could have been performed more cost-effectively by junior-level attorneys, and it suggests that the court reduce EPIC's hourly rate to $140.00 for these hours. While Pacific Lumber's argument has some validity, the court will not disallow this time.

■ Occasionally, senior-level attorneys are called upon to conduct research and draft documents; two tasks that can sometimes, but not always, be performed more cost-effectively by junior-level attorneys. This practice is not *per se* unreasonable. In fact, it is at least as reasonable as the time-honored tradition of senior-level attorneys revising briefs and memoranda drafted by junior associates. In this case, the practice was so limited that the court will not disallow it as unreasonable.

### l. *Travel Time*

■ Pacific Lumber argues that, if EPIC's counsel is awarded hourly rates based on the prevailing market rates in San Francisco rather than the prevailing market rates in their local communities, EPIC's counsel should not be reimbursed for their time spent travelling to San Francisco. Pacific Lumber contends that if EPIC had retained counsel in San Francisco, its attorneys would not have incurred travel costs. This argument lacks merit.

First, EPIC has demonstrated that it was unable to persuade any private law firm or nonprofit legal aid society in the San Francisco area to take on the risk of challenging Pacific Lumber in this lawsuit. Moreover, neither the California state government nor the federal government was willing to step forward and prosecute this case. Under the circumstances, it was perfectly reasonable for EPIC to go outside of the San Francisco area to seek legal assistance.

Second, it is quite common for clients to reimburse their attorneys for the time that they spend travelling to and from court appearances, client meetings, depositions, and similar activities, and to reimburse their attorneys for the costs associated with this travel.

Finally, the court is unwilling to disallow EPIC's travel time and expenses because of the precedent that it would establish for future cases. If a similar case were to arise in the future, where a private citizen is unable to persuade private, nonprofit and government attorneys in the community to take on a complex and risky case against a well-funded defendant, the court can conceive of a situation where disallowing EPIC's travel fees and costs in this case will only deter out-of-town attorneys from undertaking this type of representation in the future. The private citizen would be unable to prosecute their case, and the citizen suit provision of the ESA would be circumvented.

### m. *Miscellaneous*

■ Pacific Lumber has objected to 9.60 hours that Susan O'Neill spent researching and drafting a second amended complaint, and 1.25 hours that Steven Crandall spent discussing a possible motion for reconsideration. Pacific Lumber argues that the court should deny this time because these documents were never filed. In response, EPIC argues that it already has written off any time spent on these documents which was not related to EPIC's final case, and that the time identified by Pacific Lumber was not written off because it was reasonably related to the prosecution of EPIC's case. Once again, the court has no reason to doubt EPIC's representation regarding the appropriateness of this time. Without having a more specific objection from Pacific Lumber, the court will not disallow this time.

### 3. *Reasonable Costs*

The citizen suit provision of the ESA expressly provides that the court may award "costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such an award is appropriate." 16 U.S.C. § 1540(g)(4). In addition to expert witness fees, out-of-pocket expenses such as travel, courier and copying costs, may also be awarded as part of a reasonable fee award. *Davis,* 976 F.2d at 1556.

In this case, plaintiffs' attorneys are seeking reimbursement of $139,938.78 in costs that they expended during the course of this litigation.[7] Pacific Lumber initially objected to several specific categories of costs; however, most of these objections have been either withdrawn or resolved by the parties.[8] Pacific Lumber's three remaining objections are to: (1) travel costs; (2) $11,609.27 that Mr. Cowles paid to the Sierra Biodiversity Institute to produce two maps, which were admitted into evidence as Exhibits 223 and 224; and (3) the cost of videotaping depositions. For the reasons set forth in Section II.2.1. above, the court will not disallow plaintiffs' travel costs. Pacific Lumber's remaining objections will be addressed below.

### a. *Sierra Biodiversity Institute*

During the course of the trial, plaintiffs offered two computer-generated maps detailing the historic range of old-growth forests in Northern California, the present location of the old-growth remaining in California, and the correlation between the loss of old-growth and the declining population of the marbled murrelet. Pacific Lumber contends that the $11,609.27 Mr. Cowles paid to have these two maps created is "ridiculously extravagant" because they "certainly did not contribute to EPIC's case in a way justifying their exorbitant cost." (Def.'s Specific Objections at 15.) Pacific Lumber also contends that the cost of these exhibits is not recoverable because charges for expert research and analysis to prepare the content of exhibits are not recoverable as costs under 28 U.S.C. § 1920. Pacific Lumber is incorrect.

One of the primary arguments in EPIC's case was that the destruction of old-growth forests throughout their historic range in Northern California during the last 150 years has lead directly to the precipitous decline in the population of the marbled murrelet during the same period. EPIC retained Peter Morrison to produce exhibits that would graphically illustrate this argument. Over the strenuous objection of Pacific Lumber, Mr. Morrison's maps were admitted into evidence as Plaintiffs' Exhibits 223 and 224. These two exhibits played a key role in the court's determination that any further destruction of old-growth forests, including the harvesting of THP-237, could lead directly to the extinction of the marbled murrelet in Northern California. *See Marbled Murrelet v. Pacific Lumber Co.,* 880 F.Supp. 1343, 1347–48 (N.D.Cal.1995).

Citing *Romero v. Pomona,* 883 F.2d 1418, 1427–28 (9th Cir.1989), *overruled in part on other grounds,* 914 F.2d 1136, 1141 (9th Cir. 1990), Pacific Lumber contends that Mr. Morrison's charges for expert research and analysis to prepare the content of these exhibits are not recoverable as costs under 28 U.S.C. § 1920. This is true. In *Romero,* the Ninth Circuit held that, under 28 U.S.C. § 1920, one party may not shift their expert witness costs to another party under the guise of exemplification costs. *Romero,* 883 F.2d at 1428. It is also true, however, that the plaintiffs may recover Mr. Morrison's fees and costs under 16 U.S.C. § 1540(g)(4) if the court determines that they are reasonable and appropriate. After considering the important role that Plaintiffs' Exhibits 223 and 224 played in the court's determination of this case, as well as the complex task of preparing these exhibits, the court finds that

---

7. The four largest categories of costs are: (1) deposition and trial transcripts ($20,925.46); (2) expert witness fees ($40,994.51); (3) photocopies ($21,148.96); and (4) travel expenses ($23,-279.06).

8. Pacific Lumber has withdrawn its objection to the costs associated with Mr. Singer's deposition; Mr. Harris, EPIC, and Mr. Rossbach have supplemented their billing records; and Mr. Cowles has withdrawn his request for costs associated with incoming faxes and fax line charges. EPIC should also return the coffee grinder.

the cost of these exhibits is both reasonable and appropriate.

### b. *Videotaping Depositions*

Pacific Lumber has objected to the cost of videotaping depositions on the grounds that this practice was unnecessary. Pacific Lumber, however, has not made any showing that the cost of videotaping depositions is a cost that is not normally billed to fee-paying clients. Considering the logistics of this case, where most, if not all, of the witnesses reside at least 200 miles from San Francisco, it seems appropriate that EPIC would choose to videotape their depositions rather than pay the cost of having each witness travel to San Francisco to testify and then stay overnight. Videotaping depositions is a common practice in litigation. It is especially common in cases where, as here, the veracity of the witnesses is of crucial importance. The court will not disallow this cost based on the showing that Pacific Lumber has made in support of its objection.[9]

### III. *CONCLUSION*

For the reasons set forth above, the court finds that plaintiffs' counsel are entitled to an award of $1,110,344.29 in reasonable attorneys' fees and costs.

---

**9.** The court also will not disallow $262.57 in long-distance telephone charges for a deposition that was taken by telephone. This is a cost associated with the taking of a deposition, like the cost of a transcript. It is not, as Pacific Lumber contends, "in effect" the cost of attending a deposition.