Catherine A. GRUBER, a minor, by her parents and natural guardians, Gustavo and Teresa GRUBER, Petitioners,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 00–749V.

United States Court of Federal Claims.

Feb. 25, 2010.

Franklin J. Caldwell, Jr., Maglio Christopher Toale & Pitts Law Firm, Sarasota, Florida, for the Petitioners. With him were Anne C. Toale and Jennifer A. Gore Maglio, Maglio Christopher Toale & Pitts Law Firm, Sarasota, Florida.

Chrysovalantis P. Kefalas, Trial Attorney, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for the Respondent. With him were Timothy P. Garen, Director, Martin Rogers, Deputy Director, Catherine Reeves, Assistant Director, Torts Branch, Civil Division, and Tony West, Assistant Attorney General, Civil Division, United States Department of Justice, Washington D.C.

## OPINION

HORN, Judge.

### BACKGROUND

Petitioners, Gustavo and Teresa Gruber, timely filed a petition for compensation with the National Vaccine Injury Compensation Program (Vaccine Program), pursuant to the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. § 300aa–1, *et seq.* (2006) (Vaccine Act). Petitioners filed on behalf of their minor daughter, Catherine A. Gruber (Catherine), who had received a hepatitis B vaccine in 1997 and was diagnosed with juvenile dermatomyositis [1] in 1998. The parties settled the case by joint stipulation prior to an evidentiary hearing. Thereafter, the Special Master issued a decision awarding compensation to Petitioners in the amount of $125,000.00, pursuant to the parties' stipula-

---

1. As stated in the report submitted by Dr. Andrew J. White, one of Petitioners' expert witnesses, juvenile dermatomyositis can be described as a "rare autoimmune disease [] belonging to the group of idiopathic inflammatory myopathies (MM)," which are "diseases in which the immune system injures skeletal muscle." According to Dr. White, although the etiology of juvenile dermatomyositis is "relatively unknown ... environmental exposures and infectious agents are thought to play a role in disease pathogenesis."

tion. Judgment was entered and accepted by Petitioners.

Petitioners filed an initial Application for Attorneys' Fees and Costs with the Special Master. Respondent filed their Objections to Petitioners' Application for Attorneys' Fees and Costs, to which Petitioners filed their Reply to Response to Application for Attorneys' Fees and Costs in which they amended their initial Application for Attorneys' Fees and Costs. Thereafter, Petitioners submitted their Supplement to Application for Fees and Costs in which Petitioners increased their request for probate attorneys' fees. Subsequently, the Special Master issued her decision awarding attorney fees and costs.

Upon review, it appears that, in addition to amendments regarding the fees and costs requested before the Special Master, there are differences in the numbers requested by Petitioners, and those objected to by Respondent, as well as those reported by the Special Master. If anything is clear in this case, it is that all participants could have offered less summary information, offered more organized and detailed submissions, with fuller explanations and more precise data and should have tried to reconcile the numbers. For example, the Special Master, and Petitioners double-counted Petitioners' requested $4,269.50 in probate attorneys' fees and costs, which Petitioners had requested as part of, not in addition to, their requested costs for the Petitioners' attorneys of record, at the Maglio Christopher Toale & Pitts Law Firm (Maglio Firm). Therefore, the total amounts in Table A, below, are adjusted downward by $4,269.50 to correct for the double-counting.[2] As reflected in Table A, Petitioners requested a total of $80,158.95 in fees and costs for the Maglio Firm ($59,-567.50 fees + $20,591.45 costs = $80,158.95), and the Special Master awarded $62,502.45 in fees and costs for the Maglio Firm ($45,-156.00 fees + $17,346.45 costs = $62,502.45), a difference of $17,656.50.

The following tables summarize Petitioners' multiple requests and the Special Master's award.

### TABLE A

| | 12/19/08 P [3] Initial App. For Attorneys' Fees and Costs | 2/10/09 P Reply to Response to App. For Attorneys' Fees and Costs | 4/2/09 P Supplement to Application for Fees and Costs | 6/24/09 Spec. Mstr. Award |
|---|---|---|---|---|
| **P litigation costs** | $ 2,977.69 [a] | $ 2,977.69 | $ 2,977.69 | $ 2,977.69 [b] |
| **Maglio Firm attorneys' fees** | $54,227.00 | $59,567.50 [c] | $59,567.50 | $45,156.00 |
| **Maglio Firm costs** | $23,096.45 [d] | $20,348.95 [e] | $20,591.45 [f] | $17,346.45 [g] |
| **Shoemaker [4] attorneys' fees** | $ 8,276.17 | $ 8,276.17 | $ 8,276.17 | $ 6,500.00 |
| **Shoemaker costs** | $ 290.96 | $ 170.96 [h] | $ 170.96 | $ 170.96 |
| **TOTAL** | $88,868.27 | $91,341.27 | $91,583.77 | $72,151.10 [i] |

### Explanatory Notes—TABLE A

2. The court has adjusted downward total fees and costs in each column in Table A, below, by $4,269.50. The court has done so, despite the fact the additional probate fees and costs were not included until the Petitioners' Supplement to Application for Fees and Costs was submitted to the Special Master. However, in the Special Master's decision, the Special Master referenced the entire $4,269.50 when identifying the fees

a. Petitioners requested $2,977.69 in liti-and costs in Petitioners' initial Application for Attorneys' Fees and Costs.

3. P = Petitioners, App. = Application, Spec. Mstr. = Special Master.

4. Clifford J. Shoemaker, of Shoemaker & Associates, Petitioners' former attorney of record.

gation costs includes, among other expenses, $1,227.00 in guardianship costs paid by Petitioners to their Illinois probate counsel, Malkinson & Halpern, P.C., for a filing fee and surety bond.

b. Because the $2,977.69 awarded is the full amount requested by Petitioners for general litigation costs (including guardianship costs), this portion of the Special Master's award is not in dispute.

c. This upward adjustment reflects $5,340.50 in additional attorneys' fees for 16.9 hours of attorney time and 7.4 hours of paralegal time from Petitioners' December 19, 2008 Application for Attorneys' Fees and Costs through February 9, 2009.

d. Petitioners' requested $23,096.45 in costs for the Maglio Firm, including $2,800.00 paid by the Maglio Firm to Petitioners' Illinois, probate counsel, Malkinson & Halpern, P.C., in probate attorneys' fees.

e. This downward adjustment of $2,747.50 reflects: (1) a revised bill from Petitioners' expert, Dr. Rabinovich, in which she requested $3,850.00, instead of her previous request of $6,600.00, a reduction of $2,750.00; and (2) an additional $2.50 in copying costs incurred by the Maglio Firm during January 2009.

f. In their Supplement to Application for Fees and Costs dated April 2, 2009, Petitioners raised their request for probate attorneys' fees from $2,800.00 to $3,042.50, an increase of $242.50, bringing the total request for Maglio Firm costs to $20,591.45.

g. In her award, the Special Master appears to have omitted $2.50 claimed by the Maglio Firm for January 2009 copying costs. This omission resulted in the Special Master awarding the Maglio Firm $17,346.45 in costs instead of $17,348.95, which resulted in her awarding $62,502.45 in total fees and costs for the Maglio Firm, rather than $62,504.95. Based on the fees and costs for which she gave credit in her award, including the $2.50 requested by the Maglio Firm for January 2009 copying costs, the Special Master should have calculated the total award of fees and costs to the Maglio Firm as $62,504.95.

h. This downward adjustment of $120.00 represents a filing fee paid by attorney Shoemaker on behalf of Petitioners, but later reimbursed to Mr. Shoemaker by Petitioners. As explained in Petitioners' February 10, 2009 Reply to Response to Application for Attorneys' Fees and Costs, this amount was requested by Petitioners as part of their claim of costs, and is not payable to Mr. Shoemaker.

i. The total computed award for Petitioners, after taking into account all of the Special Master's reductions, should have been $72,153.60, not her actual award of $72,151.10. As explained above, this $2.50 discrepancy appears to be attributable to the Special Master's omission, in her award of costs to the Maglio Firm, of $2.50 for the Maglio Firm's copying costs for January 2009.

In her decision, the Special Master made the following deductions (Table B) from Petitioners' requested fees and costs for the Maglio Firm:

### TABLE B

| Spec. Mstr. Reductions in Maglio Firm Fees and Costs | *Requested* in P 2/10/09 Reply to Response to App. For Attorneys' Fees and Costs | *Awarded* in 6/24/09 Spec. Mstr. Decision | Spec. Mstr. Reduction |
|---|---|---|---|
| **Maglio Firm—Fees** | | | |
| Attorney hours for what the Special Master characterized as "paralegal | | | |

| | | | |
|---|---|---|---|
| work" (5.2 hours billed at $250.00 hourly rate) | $ 1,300.00 | $ 850.00 [j] | ($ 450.00) |
| 18 hours of travel time billed by Petitioners' counsel, Anne C. Toale, of the Maglio Firm at her 2008 hourly rate of $275.00 | $ 4,950.00 | $2,475.00 [k] | ($ 2,475.00) |
| Time spent by Toale (46.3 hours billed) and her paralegal (14.1 hours billed) researching medical literature and preparing Dr. White's expert report | $12,670.00 [l] | $1,250.00 [m] | ($11,420.00) |
| Time spent by Toale (16.9 hours billed) and her paralegal (7.4 hours billed) on this case from Petitioners' December 19, 2008 Application for Attorneys' Fees and Costs through February 9, 2009 | $ 5,340.50 | $5,274.00 [n] | ($ 66.50) |
| **Maglio Firm—Costs** | | | |
| Fees paid to Petitioners' expert, Dr. Shoenfeld, for time spent reviewing medical records and literature and writing portions of his expert report (18 hours billed at $400.00 hourly rate) | $ 7,200.00 | $4,200.00 [o] | ($ 3,000.00) |
| Attorneys' fees paid by the Maglio Firm to Petitioners' probate counsel, Malkinson & Halpern, P.C. | $ 3,042.50 [p] | $2,800.00 [q] | ($ 242.50) |
| | | **TOTAL REDUCTION:** | **($17,654.00) [r]** |

*Explanatory Notes—TABLE B*

j. The $850.00 awarded constitutes:

- $50.00 for 0.2 attorney hours, at a $250.00 hourly rate, spent updating case records and reviewing the status of a filing of medical records. This is the full amount requested by Petitioners for updating case records and reviewing medical records, and therefore this portion of the Special Master's award is not in dispute;

- $650.00 for 2 attorney hours, at a $250.00 hourly rate, and 2 paralegal hours, at a $75.00 hourly rate, rather than Petitioners' requested 4 hours of attorney time, for locating an expert witness during March and April 2007. Petitioners object to this reduction;

- $150.00 for 2 paralegal hours, at a $75.00 hourly rate, rather than Petitioners' requested 1 hour of attorney time, for preparing a medical chronology. Petitioners object to this reduction. Petitioners did not object to this reduction in their Motion for Review. However, at the hearing held by this court, Petitioners objected to this reduction.

k. The Special Master awarded compensation for the 18 hours of travel at a rate of $137.50, which is 50% of Ms. Toale's 2008 hourly rate of $275.00. Petitioners object to this reduction.

l. In their Objections to Petitioners' Application for Attorneys' Fees and Costs, Respondent claimed that the Maglio Firm requested a total of $11,425.00 for Ms. Toale and her paralegal for time spent working with Dr. White to complete his report. According to Respondent, this amount was comprised of "26 hours at $6,500.00 for Ms. Toale to research and review medical literature for the purpose of drafting Dr. White's report, 11 hours at $2,750.00 for Ms. Toale to 'draft' Dr. White's expert report, and 4.5 hours at $1,162.50 for Ms. Toale to 'finalize' Dr. White's expert report," as well as 12.8 hours at $960.00 for Ms. Toale's paralegal's medical literature research, 0.3 hours at $22.50

for "the paralegal's revision of the expert report, and $30.00 for the drafting of a letter to Dr. White and preparing of unspecified documents for shipment." In her decision, the Special Master wrote that "petitioners' counsel billed 46.3 hours for Ms. Toale's efforts and 14.1 hours of the paralegal's efforts to research, draft, and edit substantial portions of his [Dr. White's] opinion," and that "the total value of the billing entries claimed was actually $12,670.00, not the $11,425.00 cited in the response."

m. This amount constitutes $250.00, for 1 hour of Ms. Toale's 2007 hourly rate of $250.00, spent corresponding with Dr. White regarding his expert report, and $1,100.00, at Ms. Toale's 2008 hourly rate of $275.00, for 4 attorney hours spent reviewing Dr. White's report. Petitioners object to this reduction. As objected to in Petitioners' Motion for Review and conceded in Respondent's Memorandum in Response to Petitioners' Motion for Review, the Special Master calculated the total award for these tasks to be $1,250.00. The amount actually awarded by the Special Master for the tasks for which she gave credit should have been calculated as $1,350.00.

n. Petitioners do not object to this reduction, and therefore this portion of the Special Master's award is not in dispute.

o. The Special Master awarded 12 hours, at an hourly rate of $350.00, for time spent by Dr. Shoenfeld reviewing medical records and literature and writing portions of his expert report. Petitioners object to this reduction.

p. In their Supplement to Application for Fees and Costs, Petitioners increased their request for probate attorneys' fees from $2,800.00 to $3,042.50.

q. The Special Master awarded $2,800.00 in probate attorneys' fees, $242.50 less than Petitioners requested in the Supplement to Application for Fees and Costs. Petitioners object to this reduction.

r. As noted in explanatory note g, because the Special Master appears to have omitted $2.50 claimed by the Maglio Firm for January 2009 copying costs, the total reduction of $17,654.00 differs by $2.50 from this court's calculation of the difference between the total fees and costs requested by the Maglio Firm and the fees and costs awarded by the Special Master.

Petitioners have presented multiple objections to the Special Master's award of attorneys' fees and costs. First, Petitioners object to the Special Master's award of only $650.00 for 2 attorney hours (at a $250.00 hourly rate) and 2 paralegal hours (at a $75.00 hourly rate), rather than $1,000.00 for 4 attorney hours (at a $250.00 rate), for time spent by Ms. Toale locating an expert witness. In awarding 2 paralegal hours in place of 2 attorney hours, the Special Master asserted that "although it is appropriate for an attorney to play a role in the location and selection of expert witnesses, the description [in Ms. Toale's billing records] of the work performed does not reflect what was being done to locate the witness."[5] Furthermore, the Special Master took the position that, although an attorney's involvement "is often necessary in order to persuade" an expert to review a case, "[i]t is certainly within the ambit of a paralegal specialist's capabilities to locate potential expert witnesses, whether through a literature search, an examination of the authors of relevant publications, or through contact with agencies that specialize in such tasks."

Second, Petitioners object to the Special Master's substitution of 2 paralegal hours, at a $75.00 hourly rate, for the 1 attorney hour at a $250.00 requested by Petitioners for Ms. Toale's preparation of a medical chronology. As justification for this reduction, Special Master Vowell stated her view that "[b]illing

---

5. Ms. Toale's billing records claimed 2 hours on March 1, 2007 spent "look[ing] for [an] additional expert," 2 half-hour increments on April 12, 2007 spent "attempt[ing] to find [an] expert witness" and "look[ing] for [an] additional expert," respectively, and 1 hour on April 13, 2007 spent "look[ing] for [a] new expert witness."

an hour of attorney time to prepare a medical chronology is not appropriate" because "such tasks are commonly performed by paralegal staff or nurse consultants at much lower rates. . . ." Furthermore, the Special Master indicated that "[a]lthough petitioners implied that the paralegals employed by Ms. Toale's firm were unable to prepare a chronology, their inability to do so does not warrant paying an attorney at attorney rates to perform a paralegal's task."

Third, Petitioners object to the Special Master's reduction in compensation for Ms. Toale's travel time and assert that the "standard practice" utilized by Special Masters in the Vaccine Program of awarding compensation for reasonable attorney travel time at half the hourly attorney rate is "founded on invalid case law and is in contravention of controlling law." The Maglio Firm billed a total of $4,950.00 in attorneys' fees for 18 hours of Ms. Toale's travel time at her full 2008 hourly rate of $275.00.[6] The Special Master awarded $2,475.00, for 18 hours of travel at 50% of Ms. Toale's 2008 full hourly rate of $275.00. In awarding a reduced hourly rate for Ms. Toale's travel time, Special Master Vowell stated that:

> The standard practice in the Vaccine Program is that attorney travel time is billed at half the hourly rate, reflecting that even if an attorney is performing case-related work [while traveling], the vicissitudes of travel are such that no attorney is operating at peak efficiency on an airplane or a train, much less while traveling to or from an airport, undergoing security screening, or boarding or exiting an aircraft.

(emphasis added). The Special Master also found that, even assuming that attorney travel time could be considered fully compensable if spent working, "Ms. Toale did not assert that the 14 hours of travel time [to and from the July 25, 2008 mediation session in Washington, D.C.] . . . were *actually spent* performing work on petitioners' case, merely that it was *her practice to do so* to prepare for the upcoming event." (emphasis in original). Furthermore, the Special Master found that "as he [Ms. Toale] did not mention, even in terms of her general practice, any work on the case performed during the return travel time." Therefore, because of the Vaccine Program's "standard practice," and because there was "no evidence that case-related tasks were performed during this particular travel," the Special Master compensated Ms. Toale's travel time at 50% of her 2008 billing rate. The Special Master also indicated in her decision that, if "the time sheets . . . reflect the work performed [during travel] and the hours spent performing it," these hours would be fully compensated.

Fourth, Petitioners object to the Special Master's reduction of attorneys' fees for time spent by Ms. Toale and her paralegal researching medical literature and drafting of Dr. White's expert report. Petitioners sought $12,670.00 in compensation for 46.3 hours of Ms. Toale's time and 14.1 hours of her paralegal's time spent communicating with Dr. White regarding his expert report, researching medical literature and drafting and editing portions of that report.[7] Notwithstanding the lower hourly rates commanded by Ms. Toale and her paralegal as compared with Dr. White, who billed 10 hours at a $350.00 hourly rate for a total of $3,500.00,[8] Special Master Vowell stated that

**6.** These 18 hours consisted of 4 hours for travel to and from a meeting with Dr. Shoenfeld on April 7, 2008, and 14 hours for travel to and from a mediation session in Washington, D.C. on July 25, 2008.

**7.** As reflected in the billing entries submitted by the Maglio Firm, Ms. Toale billed the following hours at her 2007 hourly rate of $250.00: 1.8 hours for correspondence with Dr. White prior to performing medical research and drafting his report, 26 hours for medical research, 14 hours for drafting Dr. White's report, and 3 hours to "[f]inalize" and make "[f]inal revisions" to Dr. White's report. Additionally, Ms. Toale billed 1.5 hours at her 2008 hourly rate of $275.00 to

"review final changes to [Dr. White's] expert report to get report filed by deadline." Ms. Toale's paralegal billed the following hours at an hourly rate of $75.00: 13.4 hours to research and retrieve medical literature for Dr. White's report, 0.3 hours for revising Dr. White's report, 0.4 hours for drafting a letter to Dr. White and "prepar[ing] documents for ship[ment]" to Dr. White.

**8.** Respondent did not object to Dr. White's hourly rate, but questioned whether the number of hours was reasonable given Ms. Toale's efforts in preparing Dr. White's report. Nevertheless, the Special Master found Dr. White's billed rate and hours to be reasonable for his review of Cather-

"[i]t is patently unreasonable to bill over 60 hours of attorney and paralegal time to perform many tasks for a medical expert who should be able to perform them in substantially less time."[9] On the same page of her decision she also suggested that, "[p]aying an attorney or a paralegal lower rates to search for medical literature might be a more cost-effective way of providing such literature to the court than paying a doctor a higher fee to do so." The Special Master reduced the request submitted by Ms. Toale and awarded her $1,250.00 for her efforts and awarded no dollars to the paralegal. This amount constituted 1 attorney hour, at Ms. Toale's 2007 hourly rate of $250.00, for "time spent contacting and corresponding with Dr. White," and 4 attorney hours, at Ms. Toale's 2008 hourly rate of $275.00, for Ms. Toale to "read and review" Dr. White's report.[10] The Special Master stated that, "[b]ecause a Vaccine Act attorney is expected to be conversant with literature upon which an expert relies, compensation for some of the time Ms. Toale spent reviewing medical literature is appropriate." In her decision, the Special Master, nevertheless, indicated that although she was "confident that Ms. Toale and her paralegal actually performed the tasks indicated for the many hours claimed," in her opinion, "for the bulk of the hours claimed," it was not reasonable for them to do so. Special Master Vowell found that "the total number of hours claimed indicates that Ms. Toale's efforts went far beyond that of reviewing the medical literature upon which an expert relied," and that "Ms. Toale was engaged in a search of 'massive medical literature' in order to determine the research upon which

her expert [Dr. White] should rely and actually prepared a draft of the expert report." Moreover, although the Special Master stated that "[h]er paralegal will be compensated for paralegal tasks, including contacting various medical literature search agencies," Special Master Vowell did not include in her award any amount to compensate Ms. Toale's paralegal, and Petitioners challenged her failure to do so.

Fifth, Petitioners object to the Special Master's reduction of Dr. Shoenfeld's hours spent preparing his expert report and his hourly rate. Petitioners requested $7,200.00, representing 18 hours billed by Dr. Shoenfeld at an hourly rate of $400.00, for time spent by Dr. Shoenfeld reviewing medical records and writing portions of his expert report. The Special Master awarded only $4,200.00, representing 12 hours at an hourly rate of $350.00, for these efforts. In awarding $4,200.00, the Special Master concluded that Dr. Shoenfeld's billing rate of $400.00 per hour and the 18 hours he spent in preparing his expert report were both unreasonably high. In reaching this conclusion, the Special Master took note of the fact that in *Sabella v. Secretary of Health and Human Services*, 86 Fed.Cl. 201, 220–21 (2009), another Vaccine Act case, Dr. Shoenfeld was "recently awarded" compensation at a $350.00 hourly rate, which the *Sabella* court deemed reasonable for expert immunologists in Vaccine Act cases. Although Petitioners cited two examples of Vaccine Act expert witnesses who were compensated at rates above $400.00 per hour,[11] the Special Master decided that "[i]n the absence of additional

ine's medical records and the medical literature provided by Ms. Toale and preparing his expert report. Although she reduced Ms. Toale's compensation for preparing Dr. White's report, she allowed the full claim by Dr. White, despite her concerns.

9. Special Master Vowell also offered the view that "[t]he sheer extent and nature of the medical research" performed by Ms. Toale and her paralegal, as well as Ms. Toale's drafting of Dr. White's report, "raise[d] considerable doubts" about Dr. White's credibility as an expert witness.

10. As objected to in Petitioners' Motion for Review and conceded in Respondent's Memorandum in Response to Petitioners' Motion for Re-

view, the Special Master made an arithmetical error when calculating the total award for Ms. Toale's time spent communicating with Dr. White and reviewing Dr. White's report. The amount awarded by the Special Master for the tasks for which she gave credit should have been $1,350.00.

11. In their Reply to Response to Application for Attorneys' Fees and Costs, Petitioners note that two medical experts, Dr. Marcel Kinsbourne and Dr. Lawrence Steinman, have been awarded $500.00 per hour and $425.00 per hour, respectively, for their work in Vaccine Act cases.

and more relevant information" regarding an appropriate hourly rate for Dr. Shoenfeld, a $350.00 hourly rate "is the best gauge of what hourly rate is appropriate." Furthermore, the Special Master determined that the 18 hours billed by Dr. Shoenfeld were "inordinately high," because "much of Dr. Shoenfeld's report is not work unique to this case" and the summary of Catherine's medical history was drafted by Petitioners' counsel.

Sixth, Petitioners object to the Special Master's awarding $4,027.00, rather than the $4,269.50 requested, for probate attorneys' fees and costs associated with Petitioners' appointment as guardians.[12] The Special Master determined that Petitioners were entitled to the reasonable costs of establishing guardianship because Respondent had made guardianship a condition of settlement. However, the Special Master awarded only $2,800.00 in probate attorneys' fees, rather than the $3,042.50 requested in Petitioners' Supplement to Application for Fees and Costs. In explaining this reduction, the Special Master attributed Petitioners' request for higher guardianship costs in their supplemental petition to "fees generated by the misfiling of a fees application by the probate attorney," and concluded that "[t]he additional fees are not warranted to correct the mistakes of counsel."

Seventh, Petitioners object to the Special Master's arithmetical computation of her award for 1 hour of Ms. Toale's time at her 2007 hourly rate of $250.00 for corresponding with Dr. White regarding his expert report and 4 hours of her time at her 2008 hourly rate of $275.00 for reviewing Dr. White's report. For these hours, the Special Master awarded $1,250.00, but should have calculated the number as $1,350.00. In addition, Petitioners challenge the Special Master's total calculation of attorneys' fees and costs awarded to the Maglio Firm.

**DISCUSSION**

When reviewing a Special Master's decision, a judge of the United States Court of Federal Claims may:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or,

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2). The court may set aside a Special Master's decision only if the court determines that the "findings of fact or conclusion of law of the special master ... [are] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 42 U.S.C. § 300aa–12(e)(2)(B); *see also Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1347 (Fed. Cir.) ("Under the Vaccine Act, we review a decision of the special master under the same standard as the Court of Federal Claims and determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 42 U.S.C. § 300aa–12(e)(2)(B)), *reh'g and reh'g en banc denied* (Fed.Cir.2008)); *Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321 (Fed.Cir.2010); *Markovich v. Sec'y of Health & Human Servs.*, 477 F.3d 1353, 1356–57 (Fed.Cir.), *cert. denied*, 552 U.S. 816, 128 S.Ct. 92, 169 L.Ed.2d 21 (2007); *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1360 (Fed.Cir.2000). The United States Court of Appeals for the Federal Circuit has indicated that:

These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judg-

**12.** The $4,027.00 awarded by the Special Master constitutes $1,227.00 in guardianship costs incurred by Petitioners and $2,800.00 in attorneys' fees for Petitioners' Illinois probate counsel, Malkinson & Halpern, P.C. As the $1,227.00 in guardianship costs is the full amount requested by Petitioners, they do not object to that portion of the Special Master's award. Rather, Petitioners' objection is limited to the $2,800.00 awarded for probate attorneys' fees. In their Supplement to Application for Fees and Costs, submitted to the Special Master, Petitioners requested $3,042.50 in attorneys' fees for Petitioners' probate counsel, Malkinson & Halpern, P.C.

ment. Fact findings are reviewed by us, as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the "not in accordance with law" standard; and discretionary rulings under the abuse of discretion standard. The latter will rarely come into play except where the special master excludes evidence.

*Munn v. Sec'y of Health & Human Servs.,* 970 F.2d 863, 871 n. 10 (Fed.Cir.1992).

■ The arbitrary and capricious standard is "well understood to be the most deferential possible." *Id.* at 870 ("With regard to both fact-findings and fact-based conclusions, the key decision maker in the first instance is the special master. The Claims Court owes these findings and conclusions by the special master great deference—no change may be made absent first a determination that the special master was 'arbitrary and capricious.'") (citing 42 U.S.C. § 300aa–12(e)(2)(B)). Generally, "reversible error is 'extremely difficult to demonstrate' if the special master 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" *Lampe v. Sec'y of Health & Human Servs.,* 219 F.3d at 1360 (quoting *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.,* 940 F.2d 1518, 1528 (Fed.Cir.1991)); *see also Avila ex rel. Avila v. Sec'y of Health and Human Servs.,* 90 Fed.Cl. 590, 594 (2009); *Dixon v. Sec'y of Health & Human Servs.,* 61 Fed.Cl. 1, 8 (2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)) (in turn quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ("The court's inquiry in this regard must therefore focus on whether the Special Master examined the 'relevant data' and articulated a 'satisfactory explanation for its action including a "rational connection between the facts found and the choice made." ' ")).

The purpose of the Vaccine Act, as articulated by the House of Representatives Committee on Energy and Commerce in 1986, was to "establish a Federal 'no-fault' compensation program under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R.Rep. No. 99–908, pt. 1, at 3 (1986). The Vaccine Act provides:

> In awarding compensation on a petition filed under section 300aa–11 of this title [42 U.S.C. § 300aa–11] the special master or court shall also award as part of such compensation an amount to cover—
>
> > (A) reasonable attorneys' fees, and
> >
> > (B) other costs,
>
> incurred in any proceeding on such petition. If the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought.

42 U.S.C. § 300aa–15(e)(1).[13] Additionally, the Vaccine Act prohibits Petitioners' attorneys from "charg[ing] any fee for services in connection with a petition filed under section 300aa–11 of this title [42 U.S.C. § 300aa–11] which is in addition to any amount awarded as compensation by the special master or court...." 42 U.S.C. § 300aa–15(e)(3).

Although subsequent history may have called into question some of these statements regarding the simplicity of Vaccine Act cases, the legislative history to the Vaccine Act suggests that, due to the "straightforward nature of the petition and the proceedings [under the Vaccine Act]," Congress envisioned reasonable attorneys' fees and costs to be significantly lower than in traditional tort litigation. H.R.Rep. No. 99–908, pt. 1, at 22. In its report on H.R. 5546, the "National Childhood Vaccine Injury Act of 1986," the

---

**13.** In this case, because Petitioners were awarded compensation in the amount of $125,000.00 pursuant to the parties' joint stipulation, it is unnecessary for the court to determine whether Petitioners brought their petition in good faith and whether there was a reasonable basis for their claim.

United States House of Representatives Committee on Energy and Commerce offered the following thoughts regarding the attorneys' fees provision in section 2115(d) of the Vaccine Act:

> Matters to be demonstrated before compensation can be awarded [under the Vaccine Act] are relatively narrow and well-defined. Traditional discovery, cross-examination, pleadings, and trial are not allowed in the proceeding on a petition. Because of the straightforward nature of the petition and the proceedings, the Committee does not anticipate that reasonable attorneys' fees will be large. (For example, attorneys' fees in a similar compensation program for black lung disease have proven to be well below those that might be expected in litigation and have, in almost all cases, been less than $15,000 in total.) Conversely, however, the Committee does not intend that the limitation of fees to those included in the award act to limit petitioners' ability to obtain qualified assistance and intends that the court make adequate provision for attorneys' time and that the court exercise its discretion to award fees in non-prevailing, good-faith claims.

H.R.Rep. No. 99–908, pt. 1, at 22. U.S.Code Cong. & Admin.News 1986, p. 6344.

■ Opinions of the United States Court of Appeals for the Federal Circuit have suggested that Special Masters have " 'discretion in determining the amount of a fee award' " because of their " 'superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.' " *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed.Cir.1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The Federal Circuit has permitted Special Masters to take into account their prior experience with the Vaccine Program and with Petitioners' counsel when awarding compensation under the Vaccine Act for attorneys' fees and costs. *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d at 1521–22 (citing *Hensley v. Eckerhart*, 461 U.S. at 430 n. 3, 103 S.Ct. 1933); *see also Carrington ex rel.*

*Carrington v. Sec'y of Health & Human Servs.*, 85 Fed.Cl. 319, 324 (2008). Furthermore, a Special Master is not limited to the objections raised by Respondent. *See Lamar ex rel. Lamar v. Sec'y of Health & Human Servs.*, No. 99–584V, 2008 WL 3845157, at *6 (Fed.Cl. Jul. 30, 2008) (citing *Moorhead v. United States*, 18 Cl.Ct. 849, 854 (1989)).

■ The United States Court of Appeals for the Federal Circuit applies the so-called "lodestar" approach to determine what are "reasonable attorneys' fees" in a particular case under the Vaccine Act. *See Avera v. Sec'y of Health & Human Servs.*, 515 F.3d at 1347. This approach requires a preliminary calculation of reasonable attorneys' fees by " ' multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.' " *Id.* at 1347–48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). Following this initial estimate, a court may adjust the fee award upward or downward "based on other specific findings." *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d at 1348 (citing *Blum v. Stenson*, 465 U.S. at 888, 104 S.Ct. 1541).

■ The United States Supreme Court has defined reasonable hourly rates as "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. at 895 n. 11, 104 S.Ct. 1541; *see also Avera v. Sec'y of Health & Human Servs.*, 515 F.3d at 1348. Awards of attorneys' fees under the Vaccine Act are determined using the "prevailing market rate" in the District of Columbia, the litigation forum, except where " 'the bulk of [an attorney's] work is done outside the jurisdiction of the court and where there is a *very significant* difference in compensation favoring D.C." *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d at 1349 (quoting *Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. Envtl. Prot. Agency*, 169 F.3d 755, 758 (D.C.Cir.1999)) (emphasis in original) (recognizing the *Davis* exception because it "represents a sound approach to setting the reasonable rate of attorneys' fees in Vaccine Act cases in which

the bulk of the work is done outside of the District of Columbia in a legal market where the prevailing attorneys' rates are substantially lower."). When the *Davis* exception is triggered, the "prevailing market rate" is that of the community in which the attorney performed the legal services. *See Avera v. Sec'y of Health & Human Servs.*, 515 F.3d at 1350 (applying Wyoming rates because appellant's attorneys performed all work in Cheyenne, Wyoming, no hearing was held, the attorneys did not appear in the District of Columbia, and the District of Columbia market rate was "significantly higher" than the market rate in Cheyenne).

■ In determining the amount of hours reasonably expended on the litigation, a Special Master has discretion to exclude hours expended that are " 'excessive, redundant, or otherwise unnecessary....' " *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d at 1521 (quoting *Hensley v. Eckerhart*, 461 U.S. at 434, 103 S.Ct. 1933); *see also Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d at 1521 ("It ... [is] well within the special master's discretion to reduce the hours to a number that, in his [or her] experience and judgment, was reasonable for the work done.").

■■ A fee applicant has the burden to establish entitlement to a fee award by documenting the hours expended, as well as the hourly rates, by keeping records "in a manner that will enable a reviewing court to identify distinct claims." *Hensley v. Eckerhart*, 461 U.S. at 437, 103 S.Ct. 1933. A court's accurate assessment of the number of hours reasonably expended by counsel requires " '[c]ontemporaneous time records that indicate [ ] the date and specific character of the service performed, the number of hours (or fraction thereof) expended for each service, and the name of the person provid-

ing the service.' " *Ceballos ex rel. Ceballos v. Sec'y of Health & Human Servs.*, No. 99–97V, 2004 WL 784910, at *10 (Fed.Cl. Spec.Mstr. Mar. 25, 2004) (quoting *Guidelines for Practice Under the National Vaccine Injury Compensation Program* at 31 (2004)); *see also Naporano Iron & Metal Co. v. United States*, 825 F.2d 403, 404 (Fed.Cir. 1987) (finding that, under the Equal Access to Justice Act, "contemporaneous records of attorney's time and usual billing rates, as well as a breakdown of expenses, are necessary in order to determine the reasonableness of the charges.").

In their Motion for Review, Petitioners do not object to the Special Master's use of the prevailing market rate in Sarasota, Florida, the community in which a major portion of the Maglio Firm's services were performed, instead of using the forum rate in Washington, D.C.[14] Rather, in addition to raising arithmetic errors, Petitioners object to the Special Master's determination of: (1) the amount of attorney, paralegal and expert hours reasonably expended by the Maglio Firm in the *Gruber* matter, (2) the appropriate billing rate at which Ms. Toale's travel time should be compensated, and (3) the amount of costs reasonably incurred by the Maglio Firm.

### I. The Special Master's award of two attorney hours and two paralegal hours for securing an expert witness.

■ Petitioners first object to Special Master Vowell's award of $650.00, constituting 2 hours of attorney time at a $250.00 rate and 2 hours of paralegal time at a $75.00 rate, rather than Petitioners' requested $1,000.00 for 4 hours of attorney time at the $250.00 rate, for time spent by Ms. Toale locating an expert witness, with no hours of paralegal time requested for this task.

14. Respondent also did not challenge the hourly rates requested by either Mr. Shoemaker or Ms. Toale. In her decision, the Special Master found that "the rates are reasonable and appropriate and do not contravene the Federal Circuit's requirements, set forth in *Avera II* [*Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343]," because Mr. Shoemaker's hourly rate was "the subject of an agreement negotiated [between the parties] before *Avera II* " and Ms. Toale's hourly rate was "in accord with the *Davis* [*Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. Envtl. Prot. Agency*, 169 F.3d 755] exception...." The Respondent, however, did object to Petitioners' claim for the full attorney rate for travel time billed by Ms. Toale, noting the Vaccine Program's "standard practice" of compensating travel time at 50% of the attorney's billing rate, and suggesting "a reduction of 7 hours and $1,925.00."

Petitioners argue that the Special Master's reduction in attorney hours for securing an expert witness was arbitrary and capricious. In their Reply to Response to Application for Attorneys' Fees and Costs, Petitioners argued that attorneys are uniquely qualified to locate and communicate with potential expert witnesses, particularly in Vaccine Act cases, because they have attended hearings, presented expert testimony, and observed experts' cross-examination, and, therefore, can explain to a potential expert what is involved in the case. Petitioners argue that this is "especially true in the Vaccine program, a field 'bereft' of direct proof of how vaccines sometimes injure people, and where substantive issues, such as the difference between scientific certainty or medical proof, and legal causation, often must be explained in the very first contact with a potential expert." Petitioners assert that locating expert witnesses "is a task of grave importance" in order to prevail on petitions for compensation under the Vaccine Act, particularly in cases involving rare disorders such as juvenile dermatomyositis.[15] Petitioners further note that one alternative suggested by Special Master Vowell—that of having a paralegal contact agencies that specialize in locating experts would likely entail significantly greater costs than Petitioners' requested 4 hours of attorney time. In support of their argument that it was reasonable to bill attorney time for securing expert witnesses, Petitioners rely on *Rupert v. Secretary of Health and Human Services,* No. 99–0774V, 2002 WL 360005, at *5 (Fed.Cl.Spec.Mstr. Feb. 14, 2002) (noting the propriety of Vaccine Program attorneys "engaging appropriate medical experts" and "discussing the case with medical experts"), and *Wadie v. Secretary of Health and Human Services,* No. 99–493V, 2009 WL 961217, at *8 (Fed.Cl.Spec.Mstr. Mar. 23, 2009) (awarding expert witness $350.00 per hour for searching for a gastroenterology expert).

On this issue, Special Master Vowell stated:

Finally, although it is appropriate for an attorney to play a role in the location and selection of expert witnesses, the description of the work performed does not reflect what was being done to locate the witness. It is certainly within the ambit of a paralegal specialist's capabilities to locate potential expert witnesses, whether through a literature search, an examination of the authors of relevant publications, or through contact with agencies that specialize in such tasks. On the other hand, the personal contact of an attorney with the potential expert is often necessary in order to persuade the physician or other expert to review the case. I will authorize two hours at the attorney rate and two hours at the paralegal rate for the tasks associated with locating a new expert witness.

Petitioners' counsel's claim for 4 attorney hours for locating an expert witness was not extreme or obviously excessive. In choosing to award 2 attorney hours and 2 paralegal hours for this task, rather than award only paralegal hours, the Special Master did not completely devalue the importance of attorney involvement in securing an expert witness. However, by awarding 2 attorney hours and 2 paralegal hours for locating an expert witness, the Special Master chose what appears to be an arbitrary middle ground, without explanation for the precise choice she made. As noted above, the Special Master recognized that "the personal contact of an attorney with the potential expert is often necessary in order to persuade the physician or other expert to review the case." Furthermore, development of the relationship between an attorney and his or her expert witness in the event of a hearing can be critical to the presentation of evidence. In addition, whether or not there will be a hearing is difficult to predict early in a case at the time the expert is chosen.

Although relatively minimal in terms of dollars, perhaps because the hours claimed were not large, the Special Master's action to cut the attorney time claimed to half for the attorney and half for the paralegal raises the issue as to the reasonable boundaries ap-

---

**15.** In his report, Dr. White noted that "[j]uvenile dermatomyositis (JDM) is the most common pediatric [idiopathic inflammatory myopathy], although its incidence is only about 2–3 cases per million."

plicable to a Special Master in fee-setting, and to what extent an attorney should be second-guessed on how to conduct his or her case. This is not an obvious case of an abusive claim. In picking apart this relatively limited 4 hour request, the Special Master appears to have identified an alternative number just to reduce the overall award to the attorney. Moreover, the claim submitted by Petitioners does not reference or claim any paralegal hours expended, making the Special Master's award of paralegal hours a fiction and giving the appearance of being arbitrary and capricious. The award in this regard should be remanded to the Special Master.

## II. The Special Master's award of two hours at a paralegal's rate, rather than one hour at an attorney's rate, for preparation of a medical chronology.

█ Petitioners requested $250.00, representing 1 hour of attorney time at a $250.00 hourly rate, for Ms. Toale's preparation of a medical chronology. The Special Master awarded $150.00, representing 2 paralegal hours at a $75.00 hourly rate, for this task. Petitioners did not object to this reduction in their Motion for Review. However, in their Reply to Response to Application for Attorneys' Fees and Costs, Petitioners asserted that the medical complexity of Vaccine Program litigation requires that attorneys, with their higher level of discretion and expertise, prepare medical chronologies. Also, at oral argument, with all parties present, this matter was discussed with the court.

Petitioners noted two previous decisions by the same Special Master in their Reply to Response to Application for Attorneys' Fees and Costs in which Petitioners suggest that the Special Master reduced the rate claimed, asserting that the medical chronology should have been prepared by paralegals. *See Lamar ex rel. Lamar. v. Sec'y of Health & Human Servs.*, 2008 WL 3845157, at *14 ("Paralegals and nurse consultants are frequently employed in vaccine cases to prepare a chronologic record of care."); see *also Savin ex rel. Savin v. Sec'y of Health & Human Servs.*, No. 99–537V, 2008 WL 2066611,

at *5 (Fed.Cl.Spec.Mstr. Apr. 22, 2008), *review denied, aff'd*, 85 Fed.Cl. 313 (2008) ("Tasks of assembly and summarization of medical records are frequently performed by a paralegal or nurse consultant, and compensating for this task at the requested rate is unreasonable.").

In the case currently under review, the Special Master similarly concluded that, "[b]illing an hour of attorney time to prepare a medical chronology is not appropriate; such tasks are commonly performed by paralegal staff or nurse consultants at much lower rates than that of Ms. Toale." As with the 4 hours of attorney time claimed for locating an expert witness, the 1 hour of attorney time claimed for preparation of a medical chronology was not extensive. However, the task of preparing a medical chronology differed from the task of locating an expert witness. As with the above claim for securing an expert witness, Petitioners had not requested compensation for the paralegal time. The Special Master could have decreased the attorney time request, but the award for paralegal time was for work apparently not performed by a paralegal. Although a small matter, this category of Petitioners' claim also should be reconsidered by the Special Master.

## III. The Special Master's reduction in Petitioners' counsel's hourly rate for travel time.

█ Petitioners further object to the Special Master's award of compensation for Ms. Toale's travel time at the Vaccine Program, "standard practice" rate of only 50% of her 2008 billing rate of $275.00. Ms. Toale claimed 18 hours of 2008 travel time, including 4 hours for travel to and from a meeting with Dr. Shoenfeld on April 7, 2008, and 14 hours for travel to and from a mediation session in Washington, D.C. on July 25, 2008. In their Motion for Review, Petitioners contend that the Vaccine Program's "longstanding tradition, often cited to in the decisions of its Special Masters, of awarding Petitioners' counsel half of their reasonable hourly rate for time spent traveling" is "founded on invalid case law and is in contravention of controlling law," but grudgingly concede that

Ms. Toale failed to document billable work on this case while traveling in their filings to the Special Master.

On the travel time issue, the Special Master decision stated:

The standard practice in the Vaccine Program is that attorney travel time is billed at half the hourly rate, reflecting that even if an attorney is performing case-related work, the vicissitudes of travel are such that no attorney is operating at peak efficiency on an airplane or a train, much less while traveling to or from an airport, undergoing security screening, or boarding or exiting an aircraft. *See Carter v. Sec'y, HHS*, No. 04–1500V, 2007 WL 2241877, **5–7, 2007 U.S. Claims LEXIS 249, at *18–22 (Fed.Cl.Spec.Mstr. Jul. 13, 2007); *see also Scoutto v. Sec'y, HHS*, No. 90–3576V, 1997 WL 588954, *5, 1997 U.S. Claims LEXIS 195, at *17–18 (Fed.Cl. Spec.Mstr. Sep. 5, 1997); *but see Kuttner v. Sec'y, HHS*, No. 06–195V, 2009 WL 256447 (Fed.Cl.Spec.Mstr. Jan. 16, 2009) ("[W]hether travel should be billed at½ time or full time depends on whether counsel is working while traveling, the fact of traveling by itself is not determinative. . . . Thus, if counsel can establish how much of the travel time is devoted to working, those hours will be compensated fully."). In this case, Ms. Toale did not assert that the 14 hours of travel time billed were *actually spent* performing work on petitioners' case, merely that it was *her practice to do so* to prepare for the upcoming event. She did not mention, even in terms of her general practice, any work on the case performed during the return travel time.[16] As there is no evidence that case-related tasks were performed during this particular travel, the travel hours will be reimbursed at one-half the attorney billing rate. When case-related work is performed during travel, the time sheets should reflect the work performed and the hours spent performing it, with the re-

mainder of the travel hours billed at one-half the standard hourly rate.

(emphasis in original).

Petitioners rely on two arguments to support their claim for travel time compensation: (1) that the Vaccine Program's "long-standing tradition, often cited to in the decisions of its Special Masters, of awarding Petitioners' counsel half of their reasonable hourly rate for time spent traveling . . . appears to have its foundation" in *Knox ex rel. Knox v. Secretary of Health and Human Services*, No. 90–33V, 1991 WL 33242 (Cl.Ct. Feb. 22, 1991), a Vaccine Program decision that Petitioners argue is "invalid case law," and (2) that *Crumbaker v. Merit Systems Protection Board*, 781 F.2d 191 (Fed.Cir.1986), *modified on other grounds*, 827 F.2d 761 (Fed.Cir. 1987), a case in which the United States Court of Appeals for the Federal Circuit reversed a decision by the Merit Systems Protection Board to award a reduced billing rate for attorney travel time, is controlling and, therefore, precludes any reduction of an attorney's billing rate for travel time.

Although nothing in the Vaccine Act's text or legislative history appears to directly address compensation for attorney travel time, the Vaccine Program Special Masters most commonly award compensation under the Vaccine Act for attorney travel at 50% of the established billing rate. *See, e.g., Rodriguez v. Sec'y of Health & Human Servs.*, No. 06–559V, 2009 WL 2568468, at *21 (Fed.Cl. Spec.Mstr. Jul. 27, 2009); *Kuttner v. Sec'y of Health & Human Servs.*, No. 06–195V, 2009 WL 256447, at *10 (Fed.Cl.Spec.Mstr. Jan. 16, 2009); *Carter v. Sec'y of Health & Human Servs.*, No. 04–1500V, 2007 WL 2241877, at *6 (Fed.Cl.Spec.Mstr. Jul. 13, 2007); *English v. Sec'y of Health & Human Servs.*, No. 01–61V, 2006 WL 3419805, at *12–13 (Fed.Cl. Nov. 9, 2006); *Isom v. Sec'y of Health & Human Servs.*, No. 94–770V, 2001 WL 101459, at *3 (Fed.Cl.Spec.Mstr. Jan. 17, 2001); *LeBlanc ex rel. LeBlanc v. Sec'y of Health & Human Servs.*, No. 90–1607V, 1995 WL 695202, at *3 (Fed.Cl. Nov. 8, 1995).

16. The Special Master's footnote in the text at this juncture stated: "I note that, in addition to 8.5 hours of return travel time billed on July 25, 2008, counsel also billed for 5.5 hours of case-related work on that same date."

Some Vaccine Program Special Masters have indicated however, that, "the fact of traveling by itself is not determinative" in deciding whether travel should be billed at half-time, full-time or not at all, that compensation for travel time is contingent on work being performed on the case while traveling, and that the work must be sufficiently documented to qualify for compensation. *Kuttner v. Sec'y of Health & Human Servs.*, 2009 WL 256447, at *10; *see also Carter v. Sec'y of Health & Human Servs.*, 2007 WL 2241877, at * 6 ("[I]n the absence of a statement or some other evidence that work was being performed on the case at issue during travel, the ... [court] will continue to award one half of the hourly rate."); *English v. Sec'y of Health & Human Servs.*, 2006 WL 3419805, at *12–13 ("It has been a consistent practice in the [Vaccine] Program to award one-half the hourly rate for travel time unless it has been well documented as to what work was done during that time period."); *Isom v. Sec'y of Health & Human Servs.*, 2001 WL 101459, at *3 (awarding compensation for attorney travel time at half the hourly rate, except for one hour of travel time during which counsel was "engaged in a conference" regarding the case and, therefore, entitled to full compensation).

Petitioners claim that the Vaccine Program's "long-standing tradition, often cited to in the decisions of its Special Masters, of awarding Petitioners' counsel half of their reasonable hourly rate for time spent traveling ... appears to have its foundation in the decision of *Knox* ...." Petitioners assert that in considering whether to award compensation for an expert witness's travel time, the Chief Special Master in *Knox, Knox ex rel. Knox v. Sec'y of Health & Human Servs.*, 1991 WL 33242, at *7, evaluated the different approaches taken by a number of courts on the issue of compensation for attorney travel time, namely: *Henry v. Webermeier*, 738 F.2d 188 (7th Cir.1984) (full compensation for travel time); *Johnson v. University College of the University of Alabama in Birmingham*, 706 F.2d 1205 (11th Cir.) (reduced compensation for travel time), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983); and *Thomas v. Board of Education*, 505 F.Supp. 102, 104

(N.D.N.Y.1981) (no compensation for travel time). The Chief Special Master in *Knox,* decided that "compensating at a reduced rate is reasonable for several practical reasons," including: (1) the "extensive 'down time' related to any travel;" and (2) the possibility of mitigating opportunity costs associated with travel by spending travel time on "other professional activities, such as reading current medical literature, writing upcoming lectures or other desk related activities." *Knox ex rel. Knox v. Sec'y of Health & Human Servs.*, 1991 WL 33242, at *8. The Chief Special Master in *Knox,* however, did indicate that his choice of a 50% compensation standard was "[f]or ease of calculation...." *Id.*

In the first place, none of the cases cited in *Knox ex rel. Knox v. Secretary of Health and Human Services*, namely: *Henry v. Webermeier, Johnson v. University College of the University of Alabama in Birmingham*, or *Thomas v. Board of Education*, were issued by the United States Supreme Court or the United States Court of Appeals for the Federal Circuit and, therefore, are not binding precedent on this court. Similarly, the *Knox* decision, issued by a Vaccine Program Special Master, is not dispositive precedent. Therefore, Petitioners' attempt, if successful, to undermine *Knox* would not resolve the underlying question of at what level of compensation Special Masters should award Petitioner's attorneys' fees for attorney travel time. In analyzing *Knox,* the court notes that the decision in *Johnson* was based on the United States Court of Appeals for the Eleventh Circuit's conclusion that "the exclusion of out-of-town counsel's travel time is proper only if it was unreasonable not to hire qualified local counsel," *Johnson v. Univ. Coll. of Univ. of Ala. In Birmingham,* 706 F.2d at 1208, an issue not relevant to the National Vaccine Injury Compensation Program which is litigated in a national court. With respect to the *Thomas* case, no rationale was given for the rejection of the 21 hours of travel time claimed. *See Thomas v. Bd. of Educ.*, 505 F.Supp. at 104. The conclusion in *Henry,* on which Petitioners rely for full compensation for attorney travel time, is somewhat more explained, but with-

out reliance on case law. The United States Court of Appeals for the Seventh Circuit in *Henry* concluded that if the travel time is worthwhile, the billing rate "probably" should be "the same billing rate as would be appropriate for the other time the lawyers put in on the case." *Henry v. Webermeier,* 738 F.2d at 194.

As further support for their argument that the Special Master's reduction of compensation for Ms. Toale's travel time was not in accordance with law, Petitioners assert that the decision in *Crumbaker v. Merit Systems Protection Board,* 781 F.2d 191, is controlling and requires full compensation for attorney travel time. In *Crumbaker,* the United States Court of Appeals for the Federal Circuit reversed a Merit Systems Protection Board's decision to reduce the billing rate for Petitioner's counsel's travel time. *See id.* at 194. The *Crumbaker* court took issue with the Board's finding that charging attorney travel time at the same rate as other legal work was necessarily "inappropriate," *id.,* and determined that, in cases involving a statutory right to reasonable attorneys' fees, plaintiff's counsel is entitled to full compensation for travel time if: (1) they similarly charge all their paying clients for travel time at prevailing community market rates; and (2) the travel was necessary for litigating the case. *Id.* (citing *Henry v. Webermeier,* 738 F.2d at 194). The *Crumbaker* court reasoned that awarding full compensation for attorney travel time was in harmony with the purpose of 5 U.S.C. § 7701(g)(1) (2006),[17] the fees statute at issue in *Crumbaker,* which had " 'a general goal of removing impediments to the litigation of a meritorious claim.' " *Crumbaker v. Merit Sys. Prot. Bd.,* 781 F.2d at 194 (quoting *Sterner v. Dep't of the Army,* 711 F.2d 1563, 1570 (Fed.Cir. 1983)).

Notably, *Crumbaker* is the only case cited to the court in which the Federal Circuit has addressed the validity of awarding reduced compensation for attorney travel time. Re-

spondent is correct that the statutory rights and remedies at issue in *Crumbaker* differ from cases involving the Vaccine Act. Moreover, the right to attorneys' fees in *Crumbaker* was pursuant to 5 U.S.C. § 7701(g)(1), which, unlike the Vaccine Act, awards attorneys' fees only to prevailing parties. The "general goal" of the statutory fees provision at issue in *Crumbaker,* to " 'remov[e] impediments to the litigation of a meritorious claim,' " *Crumbaker v. Merit Sys. Prot. Bd.,* 781 F.2d at 194 (quoting *Sterner v. Dep't of the Army,* 711 F.2d at 1570), however, is similar to the Vaccine Act's goal of awarding compensation to vaccine-injured persons "quickly, easily, and with certainty and generosity." H.R.Rep. No. 99–908, pt. 1, at 3. In *Crumbaker,* the Federal Circuit adopted the Seventh Circuit's reasoning in *Henry,* in which the Seventh Circuit construed the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988 (2006), a statute also not before the Vaccine Program Special Masters. *Henry v. Webermeier,* 738 F.2d at 194. The court in *Crumbaker* reasoned that it would be appropriate to award "an opportunity cost that is equal to the fee he [or she] would have charged that or another client if he [or she] had not been traveling." *Crumbaker v. Merit Sys. Prot. Bd.,* 781 F.2d at 193. Therefore, although *Crumbaker* may stand for the general proposition that attorney travel time may be fully compensable, to mirror the fee charged that client or another client if the attorney had not been traveling, *id,* *Crumbaker* did not give wholesale approval to compensation of full rate, attorney travel time in every circumstance, particularly when undocumented. *See id.* at 194. The Federal Circuit in *Crumbaker* limited full compensation for attorney travel time to cases in which plaintiffs' counsel provide proof that they regularly charge their paying clients for travel time and that the rates charged are prevailing community rates. *Id.* Essential to the Federal Circuit's decision in *Crumbaker* was its recognition of the Merit

---

17. The statute, 5 U.S.C. § 7701(g)(1), provides that "the [Merit Systems Protection Board], or an administrative law judge or other employee of the Board designated to hear a case, may require payment by the agency involved of reasonable attorney fees incurred by an employee or appli-

cant for employment if the employee or applicant is the prevailing party and the Board, administrative law judge, or other employee (as the case may be) determines that payment by the agency is warranted in the interest of justice...." 5 U.S.C. § 7701(g)(1).

Systems Protection Board's previous finding in that case that plaintiff's counsel regularly charged full hourly rates to all its clients for attorney travel, and that those rates were reasonable. *Id.* (citing *Crumbaker v. Dep't of Labor,* 24 M.S.P.R. 627, 631 (M.S.P.B. 1984), *rev'd,* 781 F.2d 191 (Fed.Cir.1986), *modified,* 827 F.2d 761 (Fed.Cir.1987)).

In the case currently under review, Petitioners have asserted in their Reply to Response to Application for Attorneys' Fees and Costs submitted to the Special Master that "[i]t is the practice of Petitioners' counsel to use travel time to prepare for the upcoming event, such as the mediation in the instant case." Unlike in *Crumbaker,* Petitioners in the *Gruber* case produced no evidence, and the Special Master was unable to make a finding of fact that the Maglio Firm regularly charges its clients at full hourly rates for attorney travel time. In fact, the claim for Ms. Toale's travel time is generic and unspecified. Ms. Toale's billing entries for travel time in Petitioners' Application for Attorneys' Fees and Costs is barebones and claims the following hours: April 7, 2008, 4 hours for "travel to/from meeting with Dr. Shoenfeld;" July 24, 2008, 5.5 hours for "travel to/from DC;" July 25, 2008, 8.5 hours for "travel to/from DC." Without further specification of whether Ms. Toale used her travel time hours to work on the *Gruber* case, what her normal billing rate was for travel time, or any an explanation of why she charged 8.5 hours of travel time, as well as 5.5 hours of case related work on July 25, 2008 to the *Gruber* account, the Special Master was justified in denying full, or even any, travel time compensation.

Given the discretion allocated to the Vaccine Program Special Masters to award attorneys' fees pursuant to 42 U.S.C. § 300aa–15(e)(1), and the wildly divergent claims submitted by attorneys, even in similar cases, it is challenging to devise an automatic rule for deciding the merits of a fee claim submitted by an attorney for travel time. Nor should there be an automatic response or "standard practice" for deciding the merits of a fees and costs application. For each fees and costs application, the underlying guidance for Vaccine Program Special Masters when de-termining appropriate fee awards is articulated in the Vaccine Act at 42 U.S.C. § 300aa–15(e)(1) and requires that the fees be "reasonable." In determining reasonableness, it is not only logical, but proper practice, to require Petitioners' attorneys to document the fees claim submitted in a manner that will enable the Special Master to reach a reasoned decision. *See Hensley v. Eckerhart,* 461 U.S. at 437, 103 S.Ct. 1933 (finding that a fee applicant has the burden to establish entitlement to a fee award by documenting the hours expended, as well as the hourly rates, by keeping records "in a manner that will enable a reviewing court to identify distinct claims."); *see also Naporano Iron & Metal Co. v. United States,* 825 F.2d at 404. Consequently, although in appropriate cases, a Petitioner's attorney may be able to present a basis for an award of full attorney rates for travel time, there is no basis to make such an award in the instant case. In the future, Vaccine Program Special Masters, if presented with sufficient documentation, may find that the Vaccine Act and *Crumbaker* allow full attorney travel time compensation. Attorneys, however, should not automatically assume that it is reasonable to assess any and all travel time to a client-based destination as billable to that client. Each case should be assessed on its own merits, without resort to a convenient or "[f]or ease of calculation" formula to award travel time attorneys' fees. *See Knox ex rel. Knox v. Sec'y of Health & Human Servs.,* 1991 WL 33242, at *8. Even an automatic 50% award may be too high for an undocumented claim, given the possibility that an attorney may use the travel time to work on another matter or not to work at all while traveling. The attorney travel time issue also is remanded to the Special Master.

## IV. The Special Master's reduction of attorneys' fees for time spent by Ms. Toale and her paralegal on researching medical literature and drafting Dr. White's expert report.

Petitioners also object to the Special Master's reduction of attorneys' fees for 46.3 hours spent by Ms. Toale and 14.1 hours of her paralegal's time to research, draft and edit Dr. White's expert report. Petitioners

assert that such efforts were reasonable under the circumstances and that the Special Master's reduction of compensation for these efforts was arbitrary and capricious. In her decision, the Special Master waxed eloquent on this issue, also offering her own, non-dispositive, value judgments on the ethics of Ms. Toale and Dr. White, which are not directly at issue in this fees and costs opinion. In pertinent part, the Special Master wrote:

> Respondent challenged the nature of the work performed, as well as the hours expended, noting that the MCT firm's [Maglio Firm] hours related to preparing Dr. White's report exceeded the total of the time expended by all three of the experts in this case. . . .
>
> Both Ms. Toale's hourly rate and that of her paralegal are less than the rate billed by Dr. White. Paying an attorney or a paralegal lower rates to search for medical literature might be a more cost-effective way of providing such literature to the court than paying a doctor a higher fee to so.
>
> However, this case illustrates the principle that those commanding higher fees earn those fees, at least in part, by their efficiency in performing the tasks assigned. It is patently unreasonable to bill over 60 hours of attorney and paralegal time to perform many tasks for a medical expert who should be able to perform them in substantially less time. This holds true regardless of the difference between the higher expert rate and the lower attorney rate. The sheer extent and nature of the medical research and analysis performed by an attorney and her support staff also raises considerable doubts about the medical expert for whom these tasks were performed. Expert witnesses command higher fees because of their expertise. An expert who lacks that expertise cannot reasonably bill at a high rate for the period of time necessary to acquire it, any more than an attorney may ethically bill a client for the costs of developing expertise in a particular area of law. *See* ABA Model Code of Professional Responsibility, Canon 6–3.

> Ms. Toale will be compensated one hour, at the 2007 attorney rate of $250.00, for the time spent contacting and corresponding with Dr. White. Her paralegal will be compensated for paralegal tasks, including contacting various medical literature search agencies. Ms. Toale will not be compensated for her efforts in preparing Dr. White's expert report. Because a Vaccine Act attorney is expected to be conversant with the literature upon which an expert relies, compensation for some of the time Ms. Toale spent reviewing medical literature is appropriate. However, the total number of hours claimed indicates that Ms. Toale's efforts went far beyond that of reviewing the medical literature upon which an expert relied. It is clear from the billing entries that Ms. Toale was engaged in a search of "massive medical literature" in order to determine the research upon which her expert should rely and actually prepared a draft of the expert report.
>
> Based on the literature actually submitted with Dr. White's report, I authorize four hours, at the 2008 hourly rate of $275.00, to read and review the report, and also award the time spent contacting Dr. White for a total compensation of **$1,250.00.** I reiterate that I am confident Ms. Toale and her paralegal actually performed the tasks indicated for the many hours claimed; the issue is whether it was reasonable for them to do so. I find that, for the bulk of the hours claimed, it was not.

(emphasis in original).

■ In complex litigation, it is generally accepted that an attorney may assist a medical expert by offering supervision, conducting research for the expert, or even by drafting portions of his or her report, if a reasonable attorney would perform such work in similar circumstances. *See, e.g., Marisol A. ex rel. Forbes v. Giuliani,* 111 F.Supp.2d 381, 392 (S.D.N.Y.2000) (awarding plaintiffs compensation for 157 attorney hours spent working with an expert witness, even though the expert was ultimately withdrawn from the case, because (1) "a reasonable attorney would engage in the work under similar circumstances," (2) the expert aided plaintiffs' case

despite her withdrawal as a trial expert, and (3) such work was not duplicative of work performed by another of plaintiffs' experts.); *see also Marbled Murrelet v. Pac. Lumber Co.*, 163 F.R.D. 308, 324–25 (N.D.Cal.1995) (awarding plaintiffs 84 attorney hours for time spent " 'generally learning' about marbled murrelet biology" in order to effectively cross-examine witnesses, given the obscurity of the marbled murrelet and because "[t]his was not a task that could be performed by an expert witness who is not trained in the law.").

In Vaccine Program cases, the Special Master or the court may not find that a Petitioner has demonstrated, by a preponderance of the evidence, the requirements for compensation under the Vaccine Act "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa–13(a)(1). The medical expert reports, the testimony of the experts and the preparation for cross-examination of the experts, therefore, are critical to the presentation of Petitioner's and Respondent's cases. Moreover, as there is no discovery as a matter of right within the Vaccine Program, Special Masters are heavily reliant on opinions offered by the experts for each party. *See* Rules of the Court of Federal Claims (RCFC) Appendix B, Vaccine R. 7(a) (2010).

The Vaccine Act entitles Petitioners to compensation only for " 'hours reasonably expended on the litigation.' " *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d at 1348 (quoting *Blum v. Stenson*, 465 U.S. at 888, 104 S.Ct. 1541). The court acknowledges that when awarding compensation for attorney or paralegal hours spent working with an expert or assisting with the preparation of an expert report, as with all claims for attorneys' fees under the Vaccine Act, "[i]t . . . [is] well within the special master's discretion to reduce the hours to a number that, in his [or her] experience and judgment, was reasonable for the work done," *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d at 1521, and that "[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorney fee requests." *Id.* In determining

the amount of hours reasonably expended by the Maglio Firm on the litigation in this case, the Special Master generally had discretion to deny compensation for hours expended that were, in her judgment, "excessive, redundant, or otherwise unnecessary. . . ." *Id.* However, a reduction to an explicit billing claim by Petitioners' counsel must be explained clearly in the Special Master's decision and reasonably based on the documents and facts of the particular case.

Ms. Toale and her paralegal submitted their claims in one-tenth of an hour segments with explanations of how the time was spent. Moreover, given the requirements of the Vaccine Act, Dr. White's report was necessary to establish Petitioners' case for causation and to attempt to refute the findings of the government's expert, Dr. Rose, who opined "that there was no evidence in the literature of an autoimmune mechanism causative of this [juvenile dermatomyositis] disorder."

Petitioners assert that when the second deadline for submission of Dr. White's report had passed, Dr. White "became too time pressed to perform the substantial initial literature review required." The Maglio Firm, therefore, realized that Dr. White required assistance in order to complete his report in the time required by the Special Master. According to Petitioners, in order to ensure the timeliness and adequacy of Dr. White's report, Ms. Toale and her paralegal undertook a substantial amount of medical literature research on the etiology of juvenile dermatomyositis, and Ms. Toale prepared an initial draft of Dr. White's report. After reviewing the relevant medical literature and drafting Dr. White's report, Ms. Toale sent the draft report and accompanying medical literature to Dr. White, who reviewed the literature and made revisions to the report. Later, Dr. White discussed these changes with Ms. Toale, and Ms. Toale incorporated Dr. White's revisions into the final report. For his review of Catherine's medical records, relevant medical literature, and preparation of his report, Dr. White billed 10 hours, at a $350.00 hourly rate, for a total of $3,500.00.

Petitioners suggest that the Special Master may have based the reduction of Ms. Toale's and her paralegal's claims on a comment in the Special Master's decision which inferred that Dr. White and Ms. Toale may have violated RCFC 26 by Ms. Toale's extensive medical research and deep involvement in the drafting of Dr. White's report, although stating that the Vaccine Rules of the United States Court of Federal Claims applicable in the case were not violated.[18] RCFC 26 requires that an expert's medical opinion and testimony be "accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." RCFC 26(a)(2)(B).

Because Federal Rule of Civil Procedure 26 and RCFC 26 are "substantially identical," other federal courts' interpretations of Federal Rule of Civil Procedure 26 may inform the analysis of RCFC 26. *Sparton Corp. v. United States,* 77 Fed.Cl. 1, 4 n. 4 (2007). Federal Rule of Civil Procedure 26(a)(2)(B) requires that experts' written reports be prepared and signed by the experts, such that their testimony is accurately reflected, and that there is an obligation to disclose the data and information utilized in the expert report, as well as any summary, exhibits or charts used. Fed.R.Civ.P. 26(a)(2)(B). Therefore, the preparation of an expert report "does not preclude counsel from providing assistance to experts in preparing the reports...." Fed.R.Civ.P. 26(a)(2)(B), Advisory Committee Notes, 1993 Amendments.

Petitioners also point out that counsel has a responsibility "to ensure that the expert's report contains complete opinions that are properly and thoroughly set forth and supported...." *See Salgado ex rel. Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 741 n. 6 (7th Cir.1998) (citing the requirement for a complete report in Rule 26 of the Federal Rules of Civil Procedure and the Advisory Committee Notes thereto). Under Federal Rule of Civil Procedure 26(a)(2)(B), counsel may conduct research or even prepare drafts of an expert's report, provided such work is based on the expert's prior substantive input. *See, e.g., United States v. Kalymon,* 541 F.3d 624, 637–38 (6th Cir.2008) (finding that "there is nothing inherently nefarious" in the government's experts communicating their substantive opinions to counsel and counsel subsequently reducing these opinions to writing for experts' review and signature); *Jenkins v. Bartlett,* 487 F.3d 482, 488 (7th Cir.) (finding that the district court did not abuse its discretion by permitting testimony of two experts when a letter submitted during discovery indicated that the projected testimony was neither prepared nor signed by the experts because both experts subsequently submitted affidavits adopting the contents of the letter), *cert. denied,* 552 U.S. 1039, 128 S.Ct. 654, 169 L.Ed.2d 510 (2007); *Pritchard v. Dow Agro Scis.,* No. 07–1621, 2009 WL 3806385, at *4 (W.D.Pa. Nov.12, 2009) ("A plain reading of Rule 26(a)(2)(B) does not require that an expert personally draft his report, but instead provides that the expert report must be 'prepared and signed by the witness.'") (quoting Federal Rule of Civil Procedure 26(a)(2)(B)); *Hoskins v. Gunn Trucking,* No. 4:07–CV–72–WCL, 2009 WL 2970399, at *5 (N.D.Ind. Sept.14, 2009) (finding Federal Rule of Civil Procedure 26(a)(2)(B) was not violated when plaintiff's counsel, after receiving input from the expert, drafted the expert report and the expert reviewed and revised the report); *Wilderness Dev., LLC v. Hash,* No. CV 08–54–M–JCL, 2009 WL 564224, at *4 (D.Mont. Mar.5, 2009) (finding that the expert's report may be drafted by counsel so long as "the report is, in substance, that of the expert, the expert provides substantial input in the preparation of the report, and counsel prepares the report based on extensive discussions with the expert," even if the expert does not put pen to paper) *Crowley v. Chait,* 322 F.Supp.2d 530, 543–45 (D.N.J.2004); (concluding that plaintiff's expert prepared the

---

**18.** The Special Master explicitly stated that, "unless referenced by the Vaccine Rules (Appendix B to the RCFC), the RCFC do not apply in Vaccine Act cases." *See* RCFC Appendix B, Vaccine R. 1(c) (The rules of the United States Court of Federal Claims "apply only to the extent they are consistent with the Vaccine Rules.").

report attributed to him because the expert had discussions with plaintiff's counsel who prepared the report pursuant to their discussions; although the court noted that allowing an expert to do nothing more than sign a report drafted entirely by counsel without substantive input from the expert would violate Federal Rule of Civil Procedure 26).

There is a point at which counsel's involvement, or certainly, direction as to the outcome of an expert opinion crosses the line of propriety. In most cases, attorneys are not medical doctors or experts in the particular field at issue and vice versa. In the instant case, Dr. White was given the opportunity for input to the report and did make his own changes to the material submitted to him by counsel. Moreover, had the case gone to trial, the government would have had an opportunity to cross-examine Dr. White and explore the extent of his involvement in the report, as well as explore the basis for his personally held, expert opinion. Because this case settled before trial, is not a reason for the Special Master, necessarily, to deny or severely reduce compensation for the preparatory time spent, either by counsel or the medical expert. Nor should courts allow experts and/or counsel to abuse the system and the codes of conduct by which both legal and medical professionals are bound and, thereby, avoid compliance with applicable statutes, rules, regulations or codes of conduct.

As noted above, in order to receive attorneys' fees, counsel, in this case Ms. Toale, is responsible to document the hours she expended on the *Gruber* case "in a manner that will enable a reviewing court to identify distinct claims." *Hensley v. Eckerhart*, 461 U.S. at 437, 103 S.Ct. 1933. In their Motion for Review, Petitioners admit and assert that: "While Ms. Toale's time records appear to be incomplete, it can reasonably be implied that Ms. Toale discussed the case with Dr. White, including his role in responding to Dr. Rose's report and his initial impressions in that time frame. The initial discussion was then supplemented by e-mail correspondence between Ms. Toale and Dr. White." In her accompanying affidavit, Ms. Toale states that "not all of the work that I performed for my client is reflected in my billing entries." As examples, Ms. Toale states in her affidavit that she communicated with Dr. White in September 2007 "about his opinions regarding the above captioned [*Gruber*] case." Additionally, Ms. Toale claims that in two previous Vaccine Act cases, she "had become very familiar with Dr. White's opinions regarding the role of the Hepatitis B vaccine triggering autoimmune disorders via the mechanism of molecular mimicry," and that her research into the relevant medical literature in this case was informed by Dr. White's prior substantive input as well as her "understanding of [Dr. White's] general opinions regarding the Hepatitis B vaccine triggering autoimmune disorders using molecular mimicry...."

Ms. Toale's affidavit, however, was not submitted to the Special Master. Therefore, before this court, the government cites to RCFC Appendix B, Vaccine Rule 8(f)(1) as precluding Petitioners from raising for the first time Ms. Toale's more substantive documentation of Dr. White's opinions. Vaccine Rule 8(f)(1) states: "Any fact or argument not raised specifically in the record before the special master will be considered waived and cannot be raised by either party in proceedings on review of a special master's decision." Because Vaccine Rule 8(f)(1) bars consideration of such new facts during review by this court, at issue is whether the information included in Ms. Toale's fees and costs application sufficiently reflected the nature of the work performed and whether the Special Master's choice to fully compensate Dr. White, but severely reduce Ms. Toale's claims, was reasonable. Dr. White's compensation was not contested by Petitioners because the Special Master awarded the total fees claimed by Dr. White for his services, $3,500.00 for 10 hours, for reviewing Catherine's medical records and the medical literature, and for preparing a report. The Special Master made the full award to Dr. White, despite indicating in her decision that: "The sheer extent and nature of medical research and analysis performed by an attorney and her support staff also raises considerable doubts about the medical expert for whom these tasks were performed." When making the full award requested to Dr. White, she stated she did so, "[b]ecause I am

not compensating Ms. Toale's time in the generation of [the] report." Given the Special Master's remarks on ethics and competency, the court finds the basis of the choices in the Special Master's award unsupported regarding how to allocate compensation between Ms. Toale, Dr. White and the paralegal.

The request presented to the Special Master for the time spent by attorney Toale and her paralegal, according to the Special Master, was 46.3 hours for Ms. Toale and 14.1 hours for the paralegal. The Special Master awarded only 1 hour, at Ms. Toale's 2007 hourly rate of $250.00, for time spent by Ms. Toale "contacting and corresponding with Dr. White," out of 1.8 hours billed for such correspondence and 4 hours at the 2008 rate of $275.00 for reading and reviewing Dr. White's report. Although the Special Master indicated in her decision that the paralegal "will be compensated for paralegal tasks, including contacting various medical literature search agencies," she made no monetary award in her decision for the work of the paralegal and gave no explanation, even though she indicated that she was "confident Ms. Toale and her paralegal actually performed the tasks indicated for the many hours claimed . . . ." The court, therefore, remands these claims to the Special Master. This court is reluctant to speculate as to what figure the Special Master might have had in mind for the paralegal or the proper balance upon reconsideration between the claims filed for the attorney, the paralegal and the expert. Upon remand, the Special Master should offer support for her reductions in Ms. Toale's claim for time spent researching medical literature and drafting the expert report, given the major reductions in time awarded for her efforts, compared to time awarded to Dr. White, and the Special Master's failure to make an award for the paralegal's time.

## V. The Special Master's reduction in expert fees for Dr. Yehuda Shoenfeld.

 Petitioners further object to the Special Master's reduction in the hours awarded for Dr. Schoenfeld's preparation of his expert report. As noted above, Petitioners requested $7,200.00 for Dr. Shoenfeld's efforts, representing 18 hours at an hourly rate of $400.00. The Special Master decision awarded $4,200.00, representing 12 hours at an hourly rate of $350.00. In their Motion for Review, Petitioners argue that this reduction is arbitrary and capricious because of Dr. Shoenfeld's extensive background in immunology and because, according to the Petitioners, the Special Master in *Valdes v. Secretary of Health and Human Services*, No. 99–310V, 2009 WL 1456437, at *6 (Fed.Cl. Spec.Mstr. Apr. 30, 2009), *vacated*, 89 Fed.Cl. 415 (2009), another Vaccine Act case decided in 2009, awarded Dr. Shoenfeld compensation for 22 hours spent reviewing medical records and preparing his expert report. The court notes, however, that the final award by the Special Master was a reduction in both the rate and the number of hours requested for Dr. Schoenfeld's work in *Valdes*. *Id.*

Petitioners are entitled to compensation for reasonable costs incurred in bringing their Vaccine Act petition. 42 U.S.C. § 300aa–15(e)(1). The Special Master's award to Dr. Shoenfeld at $350.00 per hour was justified, given Dr. Shoenfeld's prior compensation at that rate. Special Master Vowell's reduction of the claim from 18 to 12 hours, also was reasonable, given the relevant evidence in the record: namely, the eight and a half page report's inclusion of: (1) a one and a half page "standard recitation of Dr. Shoenfeld's qualifications . . . that has appeared, virtually unaltered, in reports from Dr. Shoenfeld filed in other Vaccine Act cases," (2) references to "medical literature, including a number of literature surveys co-authored by Dr. Shoenfeld, referenced in his report have been filed and referenced by Dr. Shoenfeld in many other Vaccine Act cases," and (3) a two page medical chronology drafted by Petitioners' counsel.

## VI. The Special Master's reduction of attorneys' fees paid to probate counsel, Malkinson & Halpern, P.C.

 Petitioners also object to the Special Master's reduction in probate attorneys' fees paid to Petitioners' probate counsel, Malkin-

son & Halpern, P.C. The Special Master awarded Petitioners' $4,027.00, instead of the $4,269,50 Petitioners claimed. As articulated in Petitioners' Motion for Review, and established by supporting documentation appended to Petitioners' Supplement to Application for Fees and Costs, Petitioners' increased request from $2,800 to $3,042.50 in attorneys' fees does not appear to be due to any mistakes made by Petitioners' probate counsel. Petitioners' retainer agreement with Malkinson & Halpern, P.C., attached as an exhibit to Petitioners' Supplement to Application for Fees and Costs, indicated that, in the event that the firm's services exceeded 11 hours of attorney time, the firm's flat fee of $2,800.00 would be increased by $250.00 per hour for every additional hour expended. As the attorney time billed for the firm's services amounted to 12.17 hours, the billed amount of $3,042.50 represented fees for time actually expended to secure Petitioners' appointment as guardians. Therefore, the Special Master's award of only $2,800.00 in attorneys' fees incurred by Malkinson & Halpern, P.C. should be increased to $3,042.50.

## VII. The Special Master's decision contains mathematical errors.

Finally, Petitioners object to Special Master Vowell's mathematical calculations in her decision, specifically with regard to: (1) attorneys' fees awarded for time spent by Ms. Toale in working with Dr. White, and (2) the computation of the Special Master's final award. Respondent did not object and agreed that the mathematical errors had been made in the Special Master's decision.

The Special Master awarded Petitioners 1 hour at Ms. Toale's 2007 attorney rate of $250.00 per hour for corresponding with Dr. White regarding his expert report, and 4 hours at Ms. Toale's 2008 attorney rate of $275.00 per hour for reviewing Dr. White's report. As noted by Petitioners in their Motion for Review, the Special Master mistakenly calculated the total award for these tasks to be $1,250.00. This court agrees that the total amount of compensation for these tasks, based on the dollars awarded by the Special Master, should have been $1,350.00.

Additionally, Petitioners note that the Special Master's final award did not reflect an accurate sum of its constituent parts. Petitioners assert that they had requested a total of $84,185.95 for the Maglio Firm's attorneys' fees and costs as well as guardianship fees and costs. To the contrary, Petitioners requested $80,158.95 from the Special Master for these fees and costs ($59,567.50 in fees + $20,591.45 in costs = $80,158.95). In their Motion for Review to this court, Petitioners appear to have double-counted the costs they incurred in obtaining guardianship as well as the fees paid to their Illinois probate counsel, Malkinson & Halpern, P.C. As reflected in the tables above, Special Master Vowell deducted a total of $17,654.00 from Petitioners' requested fees and costs for the Maglio Firm, which amounts to $62,504.95 ($80,- 158.95 -$17,654.00 = $62,504.95). However, when the Special Master awarded Petitioners $62,502.45 in fees and costs for the Maglio Firm, she failed to address a $2.50 discrepancy between her $62,504.95 award in the body of her decision and $62,502.45 award in her conclusion. Therefore, based on the findings made by the Special Master in her decision, the total award of fees and costs incurred by the Maglio Firm should have been computed as $62,504.95, not $62,502.45, and Special Master Vowell's total award to Petitioners should have been computed as $72,153.60, not $72,151.10. This $2.50 discrepancy requires correction, even based on the amounts the Special Master considered appropriate for an award of fees and costs.

## CONCLUSION

As discussed above, seven fees and costs issues were presented to this court for review of the conclusions reached by the Special Master in her fees and costs decision. The court remands the decision to the Special Master for review in accordance with the conclusions reached in this opinion, as follows:

1) The Special Master's decision to reduce Petitioners' requested 4 attorney hours for securing an expert witness to 2 attorney hours and 2 paralegal hours is remanded to the Special Master.

2) The Special Master's decision to award Petitioners' 2 hours at a paralegal rate instead of 1 hour at an attorney rate for the preparation of a medical chronology also is remanded to the Special Master.

3) Regarding Petitioners' counsel's hourly rate for travel time, cognizant that Petitioners' counsel failed to adequately demonstrate that the Maglio Firm regularly charges its clients full hourly rates for attorney travel time and failed to adequately document that the travel time was spent on the *Gruber* matter, the court, nonetheless, remands this issue to the Special Master for review in accordance with the discussion above.

4) The Special Master's decision regarding Ms. Toale's claimed fees for time spent drafting Dr. White's expert report and researching medical literature, and for Ms. Toale's paralegal's efforts when researching medical literature also is remanded for review by the Special Master in accordance with this opinion. On remand, the Special Master should address the compensation to be awarded to the paralegal, which she failed to do in her decision, and offer support for any decision to reduce the time awarded to Ms. Toale for her time drafting the expert report and researching medical literature.

5) The Special Master was within her discretion and justified regarding her decision to reduce the amount of award to Dr. Shoenfeld, from $7,200.00 for 18 hours at an hourly rate of $400.00, to $4,200.00 for 12 hours at an hourly rate of $350.00, based on prior award to Dr. Shoenfeld at an hourly rate of $350.00, and after the Special Master's consideration of the relevant evidence in the record with respect to the level of work performed on the *Gruber* case.

6) The Special Master's reduction of the attorneys' fees incurred by Petitioners' probate counsel, Malkinson & Halpern, P.C. to $2,800.00 was in error. The amount of award to Malkinson & Halpern, P.C. is increased to $3,042.50 for the amount actually expended to secure Petitioners' appointment as guardians.

7) Finally, the Special Master's decision contained mathematical errors which should be corrected. However, based on the decision to award various portions of the Special Master's fees and costs decision, the total numbers may change upon reconsideration in accordance with this opinion.

The decision of the Special Master awarding attorney fees and costs is vacated and remanded for the issuance of an award consistent with this opinion.

**IT IS SO ORDERED.**